32 P.3d 116

STATE of Hawaii, Plaintiff–Appellee,

v.

Kuhio B. VINUYA, Defendant–Appellant.

No. 23223.

Intermediate Court of Appeals of Hawai'i.

Aug. 29, 2001.

Alan G. Warner, on the briefs, for defendant-appellant.

Richard K. Minatoya, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by LIM, J.

Defendant–Appellant Kuhio B. Vinuya (Vinuya) appeals the March 1, 2000 judgment of the circuit court of the second circuit, the Honorable Artemio C. Baxa, judge presiding, that convicted him of the offenses of (count one) assault in the second degree, in violation of Hawaii Revised Statutes (HRS) § 707–711(1)(d) (1993); (count two) carrying or use of a firearm in the commission of a separate felony, in violation of HRS § 134–6(a) (1993 & Supp.2000); (count three) place to keep firearm, in violation of HRS § 134–6(c) (1993 & Supp.2000); (count four) prohibited possession of a firearm, in violation of HRS § 134–7(b) (1993 & Supp.2000); and (count five) possession of a prohibited firearm, in violation of HRS § 134–8 (1993).

The court sentenced Vinuya to an extended indeterminate term of imprisonment of ten years on count one, a twenty-year indeterminate term of imprisonment with a mandatory minimum term of six years and eight months on count two, a ten-year indeterminate term of imprisonment on each of counts three and four, and a five-year indeterminate term of imprisonment on count five. The court ran the prison terms on counts one and two consecutively, but concurrently with the

other prison terms, for a maximum term of imprisonment of thirty years.

On appeal, Vinuya asserts that because the court erroneously denied his motion to suppress evidence—a sawed-off shotgun—recovered by the police during a warrantless search of his bedroom in his parents' house, his convictions on all five counts must be reversed.

Because we conclude that neither consent nor exigent circumstances justified the warrantless entry and search of Vinuya's bedroom, we agree with Vinuya that the sawed-off shotgun should have been suppressed. We therefore reverse in part, and vacate and remand in part.

## I. Background.

On the evening of July 8, 1999, the twenty-three-year-old Vinuya, along with Charles Barut (Barut) and Gloria Cortez (Gloria) and her sister, were riding around Kahului in Barut's car. At around 10:00 p.m., Barut pulled into the driveway at 573 Kaimana Street looking for his friend, Keola Reyes (Keola). Keola was asleep, but his younger brother Kaiana Reyes (Kaiana) joined Barut, Vinuya and the sisters in the driveway. Shortly after arriving at the Reyes house, Vinuya and Barut argued, and Barut told Vinuya to go home. Vinuya got out of Barut's car and walked across the street and two doors down to his home at 586 Kaimana Street. Vinuya left the car at about 10:30 p.m.

A short time later, Kaiana's mother drove up, so Barut reversed his car out of her driveway and parked it in front of 579 Kaimana Street. Kaiana followed and continued to talk with Barut through the passenger-side window of Barut's car.

About five minutes after Vinuya's departure, Barut heard a "big boom, like one shotgun." Then, Kaiana heard what sounded like rocks hitting Barut's car. Barut jumped out, and saw Vinuya standing behind his car. At trial, Barut testified that Vinuya appeared just as perplexed about the explosion as he was. Gloria testified, however, that after Barut got out of the car, she heard Vinuya and Barut arguing behind the car.

While Vinuya and Barut argued, a second blast occurred. Gloria then heard Barut ask Vinuya, "What you doing, crazy? What?" She also heard a woman's voice, coming from the direction of Vinuya's house, telling him to "get over here now." After the second blast, Barut got back into his car and drove off.

Kaiana's uncle, Eugene Caballero, Sr. (Caballero) testified that he approached Barut's car after the second blast and noticed that "[Vinuya] was enraged." He also saw Vinuya "put something, lift up his shirt and put something in his shorts, and all I could see was a nickel finished object. Shiny object." When asked whether he could tell what the object was, Caballero responded, "Ah, from my standpoint, no."

Kaiana thought the first "big boom" was a pipe bomb exploding. Upon hearing the explosion, Kaiana ran to his mother's car for cover, but not before being hit in his hip. The police later determined that Kaiana had been hit by bird shot fired from a shotgun.

The first police arrived at Kaimana Street at approximately 10:40 p.m. Within minutes of their arrival, they had closed a large portion of Kaimana Street, including the portion upon which the Reyes and Vinuya houses are located. During their investigation, the police recovered, among other things, an expended shotgun shot shell casing that was lying on the roadway in front of 579 Kaimana Street. They also determined that the shooter was either Vinuya or Barut and that Vinuya had reentered his house shortly after the shootings.

Believing that Vinuya was still in his house, the police secured the residence at 586 Kaimana Street. Specifically, they sought to evacuate all inhabitants from the house, and then they posted officers "at every corner of the house and the surrounding areas to prevent anybody entering or exiting the residence." The only person who responded to the police request to leave the house was Vinuya's mother, Mrs. Cora Sardinha (Mrs. Sardinha). Mrs. Sardinha told the police that she was alone in the house. However, a police officer reported that he saw someone in the house after Mrs. Sardinha had been evacuated. Thus, the police believed that

Vinuya had barricaded himself inside the house. Based on this belief, police negotiators attempted to contact Vinuya by calling to him with a bullhorn. They received no response to these efforts.

At approximately 1:00 a.m. on July 9, 1999, the special response team (SRT) of the Maui Police Department arrived on the scene. The purpose of this seventeen-member SRT was to enter the house and search for suspects.

Two hours later, the primary investigator on the case, Detective Michael Kahoohanohano (Detective Kahoohanohano), arrived at the scene. Detective Kahoohanohano met with Mrs. Sardinha, who told him that she and her husband owned the house. Detective Kahoohanohano testified at the suppression hearing that Mrs. Sardinha "told me voluntarily several times [to] go ahead and search the house. Nobody's there." He also testified that he did not coerce Mrs. Sardinha into giving her consent.

On July 9, 1999, at 5:17 a.m., the SRT entered 586 Kaimana Street to search for Vinuya. Although the house had been secured for nearly five-and-a-half hours, the police did not have, nor did they seek to obtain, a search warrant. At the October 8, 1999 suppression hearing, Detective Kahoohanohano testified that, "I believe we could have obtained a search warrant." Also, there is nothing in the record to indicate that such a request would have been inconvenient. Rather, the SRT apparently based its entry upon Mrs. Sardinha's consent.[1]

During his search of the house, Officer Mervyn Ching (Officer Ching) came upon, and forced open, the locked door to Vinuya's bedroom. At trial, Mrs. Sardinha testified that Vinuya kept his door locked "[a]ll the time[,]" even when he left his room just to shower. She further testified that Vinuya had the only key to his bedroom door, and that neither she nor other family members were allowed to enter the bedroom.

Officer Ching did not find Vinuya in the bedroom; he did see, however, a sawed-off shotgun lying on a shelf in the bedroom's open closet. The officer did not recover the gun. Instead, he reported his observation to his supervisor, who then informed Detective Kahoohanohano of the finding.

During the SRT entry and search of the house, Detective Kahoohanohano had remained on the perimeter of the area on Kaimana Street cordoned off by the police. Upon being informed of the presence of a sawed-off shotgun, he left the perimeter area, entered the house and recovered the gun from Vinuya's room.

Vinuya was arrested a few days later. On July 23, 1999, he was charged by complaint with attempted murder in the first degree, carrying or use of a firearm in the commission of a separate felony, place to keep firearm, prohibited possession of a firearm, and possession of a prohibited firearm.

On August 27, 1999, Vinuya moved to suppress, inter alia, the sawed-off shotgun. Vinuya argued that the search of his bedroom violated his rights under the Fourth Amendment to the United States Constitution, and article I, section 7 of the Hawai'i Constitution. He contended that the warrantless search was illegal for want of an applicable exception to the warrant requirement. Vinuya claimed that no exigent circumstances excused the police from obtaining a warrant before entering the house, and that they entered the premises without valid consent.

On October 8, 1999, the circuit court entertained argument on Vinuya's motion to suppress. Vinuya argued:

> So you have complete failure on proving consent. You have undisputed position that his bedroom was locked. It was his bedroom and no apparent authority to grant or the ability to consent to search his private area. There's no indication [Mrs. Sardinha] had a key or that she had any access to that premises.

1. Detective Michael Kahoohanohano testified that, at around 5:00 a.m. on July 9, 1999, another detective informed him that Mrs. Cora Sardinha (Mrs. Sardinha) had given her consent, to police officers other than the informing detective, to search the premises. However, the record is silent regarding the actual time(s) of Mrs. Sardinha's apparently multiple consents to various police officers.

The evidence is also undisputed that [the police] had held the property for approximately five and a half hours before they decided to enter. There's no evidence as to the justification for entering. Certainly time enough to get a warrant if they wanted one.

In counterpoint, the State argued that Mrs. Sardinha's consent was sufficient:

Miss Sardinha indicated that she was the owner of the house; that [Vinuya] was her son; that she owned the house with her husband; that she also had renters in the back.

She gave consent to [D]etective Kahoohanohano. If the police obtained consent, ... they don't need a search warrant.

On February 29, 2000, the circuit court filed its Findings of Fact and Conclusions of Law; Order (Order) denying Vinuya's motion to suppress. The court found, in relevant part, that:

9. Prior to the police entering into the residence located at 586 Kaimana Street, Ms. Sardinha gave verbal consent to the police to search her home.

10. At about 5:15 a.m., members of the [SRT] entered the residence located at 586 Kaimana Street in Kahului through the front screen door which was closed but unlocked.

11. A check of the living room and kitchen revealed no suspects. A bedroom which was believed to belong to [Vinuya] was locked. The bedroom door was forced open and a check revealed no suspects within the room.

12. A shotgun with an illegal barrel length was observed in plain view on a shelf within [Vinuya's] bedroom by [Officer Ching].

13. The shotgun was recovered by Detective Kahoohanohano from [Vinuya's] bedroom closet.

However, notwithstanding its finding of consent by Mrs. Sardinha, the circuit court concluded that the SRT's entry was justified by exigent circumstances. The circuit court concluded, in relevant part:

2. The "exigent circumstances" exception may apply where the State shows specific and articulable facts from which it may be determined that the officers' actions were necessitated by the exigencies of the situation which called for an immediate response.

3. In the instant case, the officers were operating under the exigency that [Vinuya], had earlier that evening fired a shotgun twice, and that [Vinuya] was still armed with the shotgun within the residence located at 586 Kaimana.

4. Additionally, given the following factors: a) the early morning hours; 2) the fact that based on witnesses [sic] statements the police believed [Vinuya] was within the house at 586 Kaimana; 3) the police saw movement within the house, and but [sic] could not locate [Vinuya]; 4) the police could not contact or locate [Vinuya] through the use of a telephone, bullhorn, or verbal commands; and 5) the police believed [Vinuya] was still armed within the residence. The police were justified, for the protection of the community, to enter into the residence at 586 Kaimana Street and seize the shotgun based on exigent circumstances.

(Case citation omitted.)

Vinuya went to trial on December 6, 1999. On January 3, 2000, the jury, instead of finding Vinuya guilty of attempted murder in the first degree under the first count of the complaint, adjudged him guilty of the included offense of assault in the second degree. The jury found Vinuya guilty as charged on the remaining four counts. On March 1, 2000, the circuit court entered its judgment, guilty conviction and sentence. Vinuya thereupon filed this timely appeal.

## II. Issues Presented.

The primary question on appeal is whether the search of Vinuya's bedroom was unconstitutional, thereby rendering inadmissible the sawed-off shotgun recovered from his bedroom. A complete analysis involves the resolution of two issues. First, we must determine whether the SRT's entry, and subsequent search, constituted a search within the meaning of the Fourth Amendment to

the United States Constitution [2] and article I, section 7 of the Hawai'i Constitution.[3] In other words, did Vinuya have a reasonable expectation of privacy, not only in his parents' house, but also in the bedroom he occupied in that house? Second, because we conclude that Vinuya did have a constitutionally-protected expectation of privacy in both the common areas of the house and his bedroom, we must ascertain whether any legally-recognized exceptions exempted the SRT's search of Vinuya's bedroom from the warrant requirements of the federal and State constitutions. Specifically, did Mrs. Sardinha have the authority to consent to the search of her son's room? Or, alternatively, did the exigent circumstances that precipitated the initial police seizure of the house persist through the SRT entry and subsequent search of the premises? We answer both questions in the negative.

Because we determine that the sawed-off shotgun should have been suppressed, we must also consider whether there is a reasonable possibility that the sawed-off shotgun contributed to Vinuya's convictions, and was therefore not harmless beyond a reasonable doubt, requiring that we set aside the convictions. *State v. Apo*, 82 Hawai'i 394, 403, 922 P.2d 1007, 1016 (App.1996) (" 'The admission of illegally obtained evidence in a criminal trial following the erroneous denial of a motion to suppress is subject to the harmless error rule.' ") (quoting *People v. Hobson*, 169 Ill.App.3d 485, 121 Ill.Dec. 588, 593, 525 N.E.2d 895, 900 (1988)) (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)) (citation omitted); *State v. Holbron*, 80 Hawai'i 27, 32, 904 P.2d 912, 917 (1995) ("the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.... [If so], then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside." (internal block quote format and citations omitted)). We conclude that the error was not harmless beyond a reasonable doubt. Hence, on the question of whether to reverse or vacate and remand, we must examine whether there was sufficient evidence adduced at trial to convict Vinuya on all five counts, the suppression of the sawed-off shotgun notwithstanding. *Apo*, 82 Hawai'i at 402–03, 922 P.2d at 1015–16.

## III. Standards of Review.

### A. Motion to Suppress.

"We review the circuit court's ruling on a motion to suppress *de novo* to determine whether the ruling was 'right' or 'wrong.' " *State v. Kauhi*, 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997). The circuit court's conclusions of law underlying its ruling on a motion to suppress are also reviewed *de novo* under the right/wrong standard. "Under the right/wrong standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Meyer*, 78 Hawai'i 308, 311, 893 P.2d 159, 162 (1995) (internal quotation marks and citations omitted). However,

[a] court's FOF [findings of fact] are reviewed under the clearly erroneous standard, *Dan v. State*, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994), and "will not be set aside on appeal unless they are determined to be clearly erroneous." *State v. Joyner*, 66 Haw. 543, 545, 669 P.2d 152, 153 (1983) (citations omitted).

*Id.* at 311, 893 P.2d at 162. A finding of fact is clearly erroneous when

---

**2.** The Fourth Amendment to the United States Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**3.** Article I, section 7 of the Hawai'i Constitution states:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

(1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.

*State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (internal quotation marks and citation omitted). In addition,

when the defendant's pretrial motion to suppress is denied and the evidence is subsequently introduced at trial, the defendant's appeal of the denial of the motion to suppress is actually an appeal of the introduction of the evidence at trial. Consequently, when deciding an appeal of the pretrial denial of the defendant's motion to suppress, the appellate court considers both the record of the hearing on the motion to suppress and the record of the trial. *State v. Nakachi*, 7 Haw.App. 28, 33 n. 7, 742 P.2d 388, 392 n. 7 (1987); *State v. Uddipa*, 3 Haw.App. 415, 416–17, 651 P.2d 507, 509 (1982); *State v. Crowder*, 1 Haw. App. 60, 66–67, 613 P.2d 909, 914 (1980).

*State v. Kong*, 77 Hawai'i 264, 266, 883 P.2d 686, 688 (App.1994).

### B. Harmless Error.

 In *Holbron, supra*, the Hawai'i Supreme Court made it clear that, with the possible exception of a limited class of trial errors not relevant here, the standard of review applicable to all trial errors is the "harmless beyond a reasonable doubt" standard. *Holbron*, 80 Hawai'i at 32 & 32 n. 12, 904 P.2d at 917 & 917 n. 12. *Holbron* also teaches that

[e]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.

*Id.* at 32, 904 P.2d at 917 (internal quotation marks, citation, and internal block quote format omitted).

### C. Sufficiency of the Evidence.

 Regarding appellate review for sufficiency of the evidence, the Hawai'i Supreme Court has repeatedly stated that

[e]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. ' "Substantial evidence" ' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*State v. Richie*, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (internal quotation marks and citations omitted). Furthermore,

[m]atters related to the credibility of witnesses and the weight to be given to the evidence are generally left to the factfinder. The appellate court will neither reconcile conflicting evidence nor interfere with the decision of the trier of fact based on the witnesses' credibility or the weight of the evidence.

*State v. Mitchell*, 94 Hawai'i 388, 393, 15 P.3d 314, 319 (App.2000) (citations omitted).

### IV. Discussion.

#### A. The Motion to Suppress.

1. *The SRT's intrusions were searches for purposes of constitutional analysis.*

On appeal, the threshold question is whether the SRT's intrusion into the premises at 586 Kaimana Street constituted a "search" within the meaning of the federal or State constitutions. *See State v. Lopez*, 78 Hawai'i 433, 441, 896 P.2d 889, 897 (1995) (stating that the first step in determining whether a governmental activity has violated a person's right to be free from unreasonable searches and seizures is to ascertain whether

that activity was a "'search' in the constitutional sense" (citations omitted)); *State v. Kuaheena,* 59 Haw. 23, 28, 575 P.2d 462, 466 (1978) ("But before the issue of the 'reasonableness' of the [governmental] activity is confronted, it must first be determined whether the activity did, in fact, constitute a search and seizure within the scope of the Fourth Amendment.").

The parties apparently assume that Vinuya had a reasonable expectation of privacy, not only in the common areas of the house, but also in his bedroom, thus exposing the SRT's search of both to the full constitutional analysis.[4] *See United States v. Johnson,* 207 F.3d 538, 544 (9th Cir.2000) (concluding that because the defendant had a reasonable expectation of privacy in the place searched, "the warrant requirement of the Fourth Amendment to the United States Constitution is implicated"); *Lopez,* 78 Hawai'i at 441–42, 896 P.2d at 897–98 (noting that governmental activity is within the scope of constitutional scrutiny when the individual is determined to have had a reasonable expectation of privacy in the place searched) (relying on *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576, (1967)).

Although Vinuya's expectation of privacy in the quarters he called "home" would appear to be a common sense conclusion, the question of whether a person residing in his or her parents' home has a reasonable expectation of privacy in those premises has not been specifically addressed in this jurisdiction.[5] We do so now, and conclude that Vinuya had a constitutionally protected expectation of privacy not only in the general premises, but also in the specific area that was his bedroom.

▉ At the outset, we confirm that Vinuya's lack of a property interest in his parents'

house is not a bar to a claim that he had a protected privacy interest in that house. In *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), the United States Supreme Court made it clear that the

> capacity to claim the protection of the [Fourth] Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion.

*Id.* at 368, 88 S.Ct. 2120 (implicitly holding that a person could have a protected privacy interest in the office he or she occupied while employed by another, so long as the facts show that the person had a reasonable expectation of privacy in that area (citing *Katz,* 389 U.S. at 352, 88 S.Ct. 507)). *See also State v. Bonnell,* 75 Haw. 124, 142–43, 856 P.2d 1265, 1275–76 (1993) (holding that a person can have a reasonable expectation of privacy in his or her workplace); *cf. State v. Matias,* 51 Haw. 62, 66, 451 P.2d 257, 260 (1969) (relying on *Mancusi* for the proposition that the defendant was not required to hold title to the place searched in order to challenge the search of the bedroom he had occupied as an overnight guest).

▉ Hence, the Fourth Amendment, and therefore article I, section 7, are implicated when the individual has a reasonable expectation of privacy in the place intruded upon by the government or its agents. In ascertaining whether Vinuya's privacy interests in the common areas of his parents' house and in his bedroom therein are constitutionally protected, we utilize the two-prong test prescribed by Justice Harlan in his concurring opinion in *Katz:*

> [F]irst that a person have exhibited an actual (subjective) expectation of privacy

4. The circuit court, in its disposition of Kuhio B. Vinuya's (Vinuya's) motion to suppress, did not make any findings or draw any conclusions on the question of whether the SRT's entry, and subsequent search, was in fact a search under the Fourth Amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution.

5. In *Stoner v. California,* 376 U.S. 483, 489, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), the United States Supreme Court decided that a hotel guest

had a reasonable expectation of privacy in the hotel room he occupied. Similarly, in *State v. Matias,* 51 Haw. 62, 66, 451 P.2d 257, 260 (1969), the Hawai'i Supreme Court determined that a house guest had a reasonable expectation of privacy in the bedroom provided by his or her host. However, "[i]t is often said that a person occupying a room in the home of his [or her] parents is not in the same situation as a person occupying a room in a hotel." W. LaFave, 3 *Search and Seizure,* § 8.4(b) (3d ed.1996).

and, second, that the expectation be one that society is prepared to recognize as "reasonable."

*Katz*, 389 U.S. at 361, 88 S.Ct. 507. *See also Kaaheena*, 59 Haw. at 27–28, 575 P.2d at 466 (reiterating the applicability of the *Katz* two-prong test in determining whether an individual has a reasonable expectation of privacy in a certain place); *Lopez*, 78 Hawai'i at 441–42, 896 P.2d at 897–98 (citing *Katz*, 389 U.S. at 361, 88 S.Ct. 507).

It is a well-established principle that the person with a possessory interest in the premises, such as a homeowner or a tenant, has a protected privacy interest in his or her home. *Lopez*, 78 Hawai'i at 442, 896 P.2d at 898 (in a case involving a police search of what was described only as a couples' "house" or "home," without specification as to the formal property interest involved, confirming that "[t]here is no question that a person generally has an actual, subjective expectation of privacy in his or her home. Nor is there any question that the expectation of privacy in one's home is one that society recognizes as objectively reasonable" (citation omitted)).

Furthermore, family members residing upon the premises without benefit of any formal possessory interest in the premises have a reasonable expectation of privacy of "essentially the same dimensions" as the owner or lessee of the premises. 5 W. La-Fave, *Search and Seizure*, § 11.3(a) (3d ed.1996). *See also Bumper v. North Carolina*, 391 U.S. 543, 548 n. 11, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (summarily concluding that the defendant had "standing to challenge the lawfulness of the search" of the house his grandmother owned, given that "the house searched was his home"); *State v. Reddick*, 207 Conn. 323, 541 A.2d 1209, 1213 (1988) (in a case involving a police search for a sawed-off shotgun of an apartment the defendant had shared, rent-free, with his mother for at least several days prior to the search, holding that "an adult son or daughter ... who is living permanently or staying temporarily with a parent in the parental home, has a reasonable expectation of privacy in that home").

Hence, it can at least be said that the physical dimension of a person's reasonable expectation of privacy in his or her home in the family manse encompasses the common areas of the property. *See, e.g., Bumper*, 391 U.S. at 548 n. 11, 88 S.Ct. 1788 (noting that the defendant had standing to challenge the search of, and subsequent seizure of the rifle "found in[,] the common part of [his grandmother's] house"). In addition, its perimeter may include those areas in which he or she has an independent expectation of privacy. *See State v. Carsey*, 59 Or.App. 225, 650 P.2d 987, 990–91 (1982) (defendant had an independent, reasonable expectation of privacy in his bedroom in his grandmother's house, where by tacit agreement with his grandmother he exercised exclusive control over the room, occupied it alone, paid his grandmother monthly rent, and did his own cleaning and laundry).

Here, the record shows that, at the time of the SRT search of 586 Kaimana Street, Vinuya lived there with his parents in the house his parents owned and occupied. We therefore conclude that he had a reasonable expectation of privacy in the common areas of that house while he resided therein. Furthermore, it is evident that Vinuya had an independent, reasonable expectation of privacy in his bedroom. Mrs. Sardinha's uncontroverted testimony made it clear that Vinuya had exclusive control over his room. He kept his bedroom door locked to prevent other family members from entering, even when he was in the house (including when he left his room to shower); no other person had the bedroom door key; and neither his mother nor any other person had access to the room. Hence, Vinuya "exhibited an actual (subjective) expectation of privacy[.]" *Katz*, 389 U.S. at 361, 88 S.Ct. 507. In this State, in which living arrangements like Vinuya's are hardly uncommon, Vinuya's expectation is moreover "one that society is prepared to recognize as [objectively] 'reasonable'." *Id.*

Thus, the SRT's intrusions into 586 Kaimana Street, and into Vinuya's bedroom therein, constituted searches within the meaning of the Fourth Amendment and article I, section 7.

### 2. *The search was unreasonable.*

In the early morning hours of July 9, 1999, more than six hours after the first police arrived on Kaimana Street, the SRT entered and searched the house owned and occupied by Vinuya's parents, and the bedroom in which he resided.

 Because we conclude, *supra*, that Vinuya had a reasonable expectation of privacy in the places searched, the warrant requirements of the Fourth Amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution were implicated. Furthermore,

> [w]e have not hesitated to extend the protections afforded under article I, section 7 of the Hawai'i State Constitution beyond those available under the cognate Fourth Amendment to the United States Constitution " 'when logic and a sound regard for the purposes of those protections have so warranted.' " *State v. Kachanian,* 78 Hawai'i 475, 480, 896 P.2d 931, 936 (App.1995) (quoting *State v. Kaluna,* 55 Haw. 361, 369, 520 P.2d 51, 58 (1974)).
>
> Textual support for this expansive approach inheres in the prohibition against "unreasonable ... invasions of privacy" contained in article I, section 7 but not found in the Fourth Amendment. *See, e.g., State v. Lopez,* 78 Hawai'i 433, 445–47, 896 P.2d 889, 901–03 (1995) (relying in part upon the textual accretion, requiring actual authority for third-party consents to search, in contradistinction to the United States Supreme Court's acceptance of mere apparent authority).

*State v. Ramos,* 93 Hawai'i 502, 507, 6 P.3d 374, 379 (App.2000).

 Because the SRT undertook a warrantless entry and search of what we have determined to be constitutionally protected areas, the search was " 'presumptively unreasonable' under both the United States and Hawai'i Constitutions." *Lopez,* 78 Hawai'i at 442, 896 P.2d at 898 (citing *Katz,* 389 U.S. at 357, 88 S.Ct. 507; additional citation omitted). Accordingly, "warrantless searches are invalid unless they fall within narrowly drawn exceptions." *State v. Mahone,* 67 Haw. 644, 646, 701 P.2d 171, 173 (1985) (citation omitted). The burden of proving that the search was reasonable is borne by the State. *State v. Clark,* 65 Haw. 488, 493, 654 P.2d 355, 359 (1982).

On appeal, the State seeks to justify the searches of Vinuya's home and bedroom by invoking the consent exception to the warrant requirement. *See, e.g., State v. Brighter,* 63 Haw. 95, 99, 621 P.2d 374, 378 (1980) (citing *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). Alternatively, the State argues that exigent circumstances exempted the SRT's entry and search of both premises from the warrant requirement. *State v. Jenkins,* 93 Hawai'i 87, 102, 997 P.2d 13, 28 (2000) (stating that a warrantless search may be justified based upon the existence of probable cause and exigent circumstances). We address each exception in turn, and determine that neither excused the police from having to secure the approval of an independent magistrate before entering Vinuya's home.

### a. *Consent.*

 This is not a case in which the defendant is challenging the validity of his own consent. Rather, this case involves consent given by the defendant's parent to government agents to search the family home, including the bedroom used exclusively by the defendant. The State argues that Mrs. Sardinha's consent encompassed the entirety of the premises occupied by her family, including Vinuya's room.[6] Vinuya counters that

---

6. The State actually offers two assertions in support of its contention that Mrs. Sardinha's consent was effective as against Vinuya's reasonable expectation of privacy in his bedroom.

For its first theory, the State essentially argues that parental authority includes the right of a parent to consent to the search of his or her child's room—no matter the child's age or intent concerning that room. Although this proposition may be palatable to the extent that the evidence adduced militates against a conclusion that the child had exclusive possession of his or her room, it is inconsistent with both the law and the facts of this case. *See* discussion, *infra.*

For its alternate theory, the State relies on 3 W. LaFave, *Search and Seizure* § 8.4(b) (3d ed.1996) in arguing that, should we determine that Vinuya had exclusive possession of his room, his reasonable expectation of privacy in that

his mother's authority stopped at his locked bedroom door. The question is, therefore, whether Mrs. Sardinha had the authority to consent to the search of Vinuya's bedroom.

Our precedent teaches us that, in the event consent is given by a third party, the third party must have the authority to consent. *Mahone,* 67 Haw. at 647, 701 P.2d at 173–74 ("A third party cannot waive another's constitutional right to privacy unless authorized to so do. Thus, the consent of a third party cannot validate a warrantless search unless the third party possessed authority to consent." (Citing *Matias, supra.*)); *cf. Matias,* 51 Haw. at 67, 451 P.2d at 260 (holding that the defendant's "constitutional right to privacy cannot be waived by another unless he has authorized another to do so"). Moreover, in Hawai'i, the third party must have actual authority, as opposed to apparent authority, in order for the consent to be valid. *Lopez,* 78 Hawai'i at 447, 896 P.2d at 903 ("in order for a consent to search to be valid under article I, section 7 of the Hawai'i Constitution, the individual consenting must actually possess the authority to do so").

In order to establish that a third party had actual authority to consent to a search of a defendant's premises or effects, the State must show "that [the] third person [had] 'access to the area searched, and either common authority over it, a substantial interest in it, or permission to exercise that access[.]'" *Mahone,* 67 Haw. at 647, 701 P.2d at 174 (quoting *United States v. Gradowski,* 502 F.2d 563, 564 (2d Cir.1974)). In addition, consent must be "freely and voluntarily given." *State v. Patterson,* 58 Haw. 462, 468, 571 P.2d 745, 749 (1977) (citations omitted).

In sum, the State bears the burden of proving that the third party possessed actual authority to consent, *Lopez,* 78 Hawai'i at 447, 896 P.2d at 903; *cf. Illinois v. Rodriguez,* 497 U.S. 177, 185, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (apparent authority suffices), and that he or she did so freely and voluntarily. *State v. Ganal,* 81 Hawai'i 358, 368, 917 P.2d 370, 380 (1996).

Vinuya questions the constitutionality of the police intrusions, first, on the grounds that the State failed to prove that his mother had actual authority to consent to the search of the general residence, and that she did so freely and voluntarily. As a fallback position, Vinuya maintains that, even if his mother's consent validated a general search of the family home, she lacked the requisite actual authority to grant permission for the search of his bedroom. Finally, Vinuya argues that the consent his mother gave to Detective Kahoohanohano cannot be imputed to the SRT because the detective was not involved in the decision to enter the house. We do not reach Vinuya's final ground for error, as

---

room "dissipated" by virtue of his criminal act, which preceded his mother's consent.

> LaFave there states, in relevant part, that even assuming exclusive use [of a particular room in his or her parents' house] by an adult offspring, *the resulting expectation of privacy may dissipate by virtue of later events preceding the parental consent,* such as long absence by the offspring without making arrangements for the storage of his effects.

*Id.* (emphasis added).

We read this passage for quite a different proposition than the one argued by the State. Although the child may have established exclusive possession of his or her room, in the interim between having established such control and the search in question, the child's action or inaction *vis-a-vis the room* may have caused the exclusivity of possession to dissipate, thereby exposing his room, and its contents, to a search based upon parental consent. LaFave illustrated this point with the example of *Cooper v. State,* 492 So.2d 1059 (Fla.1986). In *Cooper,* at the time of the

search consented to by the adult defendant's stepfather, the defendant had been incarcerated for over ten months, during which time the defendant failed to provide any instructions to his parents regarding his bedroom and its contents and defendant's parents had assumed control of the same. *Id.* at 1061. Hence, the court determined that the defendant "did not have a reasonable expectation of privacy in the bedroom he had formerly occupied." *Id.* In short, the defendant's criminal acts were not the bases for the dissipation of his privacy expectation in his bedroom; rather, it dissipated by virtue of his lengthy absence and his failure to demonstrate a continuing expectation of privacy in the bedroom.

We do not read the passage relied upon by the State for the unprecedented notion that because a child commits a crime outside the family home, the child relinquishes his or her reasonable expectation of privacy in the room he or she possesses exclusively in that home. Hence, the State's second argument has no merit.

our conclusions regarding Mrs. Sardinha's authority to consent dispose of the issue.

▇▇▇ The questions of whether the State proved that Mrs. Sardinha had the actual authority to consent to a search of, at the very least, her home's common areas, and whether she did so voluntarily, need not detain us long. The circuit court found that Mrs. Sardinha had consented to the search of her home. However, the circuit court did not provide any factual basis for this finding, nor did it specify whether any spatial limitations inhered in Mrs. Sardinha's consent. We note, nonetheless, that at the suppression hearing, Detective Kahoohanohano testified that Mrs. Sardinha told him that she and her husband owned and resided in the house, and that she had tenants in the apartment attached to the rear of the house. The detective further testified that Mrs. Sardinha's consent was not the product of coercion. Hence, at a minimum, Mrs. Sardinha, as co-owner and resident, had access to, and common authority over, the common areas of her own home. *See Mahone,* 67 Haw. at 647, 701 P.2d at 174. Mrs. Sardinha therefore had the actual authority to consent to the search of the common areas of the house.

Further, because Vinuya fails to provide any argument beyond the conclusory contention that "the time and discomfort to which [Mrs.] Sardinha was subjected constitutes coercion[,]" we need not address the matter of voluntariness. *See* Hawai'i Rules of Appellate Procedure Rule 28(b)(7) ("Points not argued [on appeal] may be waived."); *CSEA v. Doe,* 88 Hawai'i 159, 174 n. 20, 963 P.2d 1135, 1150 n. 20 (App.1998) ("Appellant, however, fails to present discernible argument with respect to these allegations and this court, therefore, need not address those matters." (Citations omitted.)); *Bank of Hawai'i v. Shaw,* 83 Hawai'i 50, 52, 924 P.2d 544, 546 (App.1996) ("[Appellant's] appeal asserts numerous grounds but fails to provide discernible argument or discussion on many of the points. We will disregard a point of error if the appellant fails to present discernible argument on the alleged error." (Citation omitted.)). Furthermore, "[o]n appellate review, the findings of a trier of fact regarding the validity of a consent to search must

be upheld unless clearly erroneous." *Ganal,* 81 Hawai'i at 368, 917 P.2d at 380 (citing *Patterson,* 58 Haw. at 468, 571 P.2d at 749).

On essentially undisputed evidence, then, we conclude that, insofar as the circuit court found that Mrs. Sardinha had actual authority to consent to the search of her home's common areas, and that her consent was voluntary, its findings are unimpugnable.

We thus arrive at the central question: whether Mrs. Sardinha had, in fact, the requisite authority to consent to the search of Vinuya's bedroom.

Vinuya asserts that even if his mother had the authority to allow the SRT to enter the house, she could not consent to an entry and search of his bedroom. In essence, Vinuya argues that because he had exclusive possession of his bedroom, he had an independent, reasonable expectation of privacy in the room impervious to his mother's unilateral consent.

▇▇▇ Vinuya's claim depends, then, upon whether Vinuya's mother was authorized to consent to a search of his bedroom, his independent privacy interest notwithstanding:

> To evaluate this claim, we must explore the relationship between the doctrine of third party consent and the concept of expectation of privacy. Without engaging in "metaphysical subtleties," *Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969), we recognize that not all the areas or containers in a room are equally private.... If a specific area is in fact surrounded by an independent privacy interest, a government agent must either obtain a warrant to search it or is required to bring his examination within one of the exceptions to the warrant requirement. Thus, the Government may scrutinize even the most private enclosure if the third party has the authority to permit the intrusion.

*United States v. Buettner–Janusch,* 646 F.2d 759, 766 (2d Cir.1981), *cert. denied,* 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981). Hence, "[c]onsent to search a general area will not validate the search of a specific area or item if that specific area or item is in fact surrounded by an independent privacy inter-

est." *Mahone,* 67 Haw. at 648, 701 P.2d at 174 (citing *Buettner–Janusch,* 646 F.2d at 766). The third party's power to consent to a search of the specific area is therefore effective only if the third party has " 'access to the area searched, and either common authority over it, a substantial interest in it, or permission to exercise that access[.]' " *Mahone,* 67 Haw. at 647, 701 P.2d at 174 (quoting *Gradowski,* 502 F.2d at 564). *See also Buettner–Janusch,* 646 F.2d at 766 ("Here too, the third party's power to consent is to be tested under the familiar Gradowski standard.").

▮▮▮ In rebuttal, the State relies on the suggestion made by LaFave in 3 W. LaFave, *Search and Seizure* § 8.4(b) (3d ed.1996), that there may be a parental authority exception in third-party consent cases. La-Fave cites *Vandenberg v. Superior Court,* 8 Cal.App.3d 1048, 87 Cal.Rptr. 876 (1970), for the principle that, inherent in the rights and duties of a parent is the authority to consent to a search of areas "which [have] been designated by the parent for the use of his [or her] children." *Id.* at 880 (citation omitted). *But see id.* at 878 (the consenting father and the defendant son shared the bedroom that was searched). However, LaFave also observes that

> it is to be doubted that it is consistent with the *Matlock* rationale to say that an emancipated person may never have a protected individual privacy interest so long as he continues to reside in the family home. The mere fact that the parents have authority to terminate this relationship does not alone establish a right on their part to intrude into an area in which, by established practice, their adult off-spring had been permitted to devote to his exclusive use.

3 W. LaFave, *Search and Seizure* § 8.4(b). Hence, parental authority may be inoperative as a basis for consent where the child is emancipated and the parents have ceded their "common authority" over the subject area. *Cf. United States v. Matlock,* 415 U.S. 164, 171 & 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (holding that "a third party who possessed common authority over or other sufficient relationship to the premises or ef-

fects sought to be inspected" can consent to a search of the same, because "it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched"); *with State v. Carsey,* 650 P.2d at 991 (where defendant lived alone in his room in his grandmother's house, paid for room and board, did his own cleaning and laundry, and both understood that he had exclusive control of his room, the court concluded that "[t]here is no reason why parents, or those acting in *loco parentis,* may not diminish their right to supervise or control their ward in that manner and, having done so, are without authority to consent to a warrantless search of their ward's private room").

The parental authority exception appears to have operated against the nineteen-year-old defendant in *Vandenberg,* because the court plainly stated that "the father-son relationship of the [defendant] and Mr. Vandenberg [ (who consented to the search) ] is the decisive element in this case[,]" and thereafter concluded:

> The record further shows that petitioner's allegation of emancipation failed for lack of proof. Accordingly, on this record, we deal with the typical case of a minor child, living with his father, in the father's home, and subject to the ordinary rules regulating the relationship of parent and minor child.

*Vandenberg,* 87 Cal.Rptr. at 880. The court further noted that

> [i]n the case before us the petitioner recognized and submitted to his father's parental authority over his person, and his parent's legal control over the use and possession of the entire premises[.]

*Id.* Such is not the case, however, with Vinuya. Even assuming, *arguendo,* that Hawai'i might recognize a parental authority exception, the facts in this case are clearly distinguishable from those in *Vandenberg,* and more amenable to the *Matlock* "common authority" rationale and its exemplification in *Carsey.*

▮▮▮ At the time of the search, Vinuya was twenty-three years old—hardly a minor

by any stretch of the imagination. Also, Vinuya was employed as a maintenance landscaper, further indication of his emancipation from his parents. In addition, Vinuya had exclusive use of his bedroom, by tacit agreement with his parents and by his practice of locking the door at virtually all times. His parents had, in essence, relinquished their "common authority" over Vinuya's bedroom, thereby rendering nugatory Mrs. Sardinha's consent to search the room. *Cf. Carsey*, 650 P.2d at 991.

The State's argument that Mrs. Sardinha's parental authority *ipso facto* trumped her adult son's independent, reasonable expectation of privacy in *his* bedroom fails for an even more fundamental reason. Extant Hawai'i law indicates that we simply do not recognize exceptions to the warrant requirement based solely upon the consenting party's status as parent.[7] This conclusion is implicit in *Lopez*, in which the Hawai'i Supreme Court concluded that, absent actual authority, a mother residing apart from her adult daughter cannot consent to a search of her daughter's house. There, the existence of actual authority, or the lack thereof, was the deciding factor—not the consenting party's parental status. *Lopez*, 78 Hawai'i at 447, 896 P.2d at 903.

The question is, therefore, whether Mrs. Sardinha had actual authority to consent to a search of her son's bedroom. It is undisputed that Vinuya had, by implicit agreement and in practice, exclusive possession of his bedroom. He thereupon had an independent privacy interest in that room. Mrs. Sardinha's testimony made it clear that an element of Vinuya's exclusive possession was his exclusion of all others from any access to, or exercise of common authority over, the room. In addition, there is no indication in the record that Vinuya gave his mother access to his room, or permission to allow others ac-

cess. Although Mrs. Sardinha retained at all times a co-ownership interest in her house as a whole, the foregoing indicates that she had ceded to her son, Vinuya, all substantial interest in his bedroom that is cognizable in this respect. *Cf. Carsey*, 650 P.2d at 991 (holding that grandmother lacked the authority to consent to a warrantless search of the room occupied exclusively by her grandson, where the facts showed that she had "diminish[ed][her] right to supervise or control [her grandson] in that manner").

It cannot be said, therefore, that Mrs. Sardinha had actual authority to consent to the search of Vinuya's bedroom. Hence, the SRT's search cannot be subsumed under the consent exception to the warrant requirement.

We now turn to examine the State's alternate assertion, that exigent circumstances justified the SRT's intrusions.

### b. *Exigent circumstances.*

Although a warrantless search is presumptively unreasonable, it may be justified "when the government has probable cause to search, and exigent circumstances exist which advise against delay in proceeding to do so." *Clark*, 65 Haw. at 494, 654 P.2d at 360 (citing *United States v. Chadwick*, 433 U.S. 1, 11, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)). Here, we pass over the question of whether probable cause to search existed, because we conclude that exigent circumstances did not exist at the time of the SRT entry and search of the house.

Exigent circumstances exist when

immediate police response is reasonably required "to prevent imminent danger to life or serious damage to property, or to forestall the likely escape of a suspect or the threatened removal or destruction of evidence." [*State v. Lloyd*, 61 Haw. 505,]

---

7. We observe, in connection with the issue of parental authority to search, that Hawai'i does not recognize spousal authority, without more, as an exception to the warrant requirement. In *State v. Evans*, 45 Haw. 622, 372 P.2d 365 (1962), the supreme court held that the wife of the defendant had no "right" to consent to a search of her husband's cuff link case that was recovered during a search of the couple's bed-

room dresser drawer. *Id.* at 631, 372 P.2d at 372. The supreme court concluded that, while the wife could consent to a general search of the couple's house because she had joint control of the premises, she had no authority to consent to a search of her husband's personal effects absent a showing that she exercised "as much control as the husband" over the property searched. *Id.* at 633, 372 P.2d at 373 (emphasis omitted).

512, 606 P.2d [913,] 918 [ (1980) ] (footnote omitted). The burden is on the State to show "specific and articulable facts from which it may be determined that the action the police took was necessitated by the exigencies of the situation." *State v. Barnett*, 68 Haw., 32, 36, 703 P.2d 680, 683 (1985) (citations, quotation marks and brackets omitted).

*Apo*, 82 Hawai'i at 400, 922 P.2d at 1013.

■ On appeal, the State contends that an "emergency situation" persisted for the entire eight-and-a-half hour impoundment of the house.[8] The circuit court concluded that exigent circumstances justified the warrantless entry. Although we agree with the court that exigent circumstances existed at the time the police impounded the house, we believe that the exigency had abated by the time the SRT entered the premises.

The initial police impoundment of Vinuya's home constituted a seizure for purposes of Fourth Amendment analysis. *State v. Dorson*, 62 Haw. 377, 381, 615 P.2d 740, 744 (1980) (because the police had sealed, and controlled access to and from, the subject premises in anticipation of getting a warrant, they had effectively seized the premises within the meaning of the Fourth Amendment).

Exigent circumstances undoubtedly precipitated, and thereby justified, the initial seizure of the house. The police arrived within minutes of the shotgun blasts. Shortly thereafter, they determined that Vinuya was a possible suspect, and that he was last seen reentering his house. The exigencies existing at that time included the violence of the act, the fact that there was at least one known victim, the involvement of a firearm, and the imminent threat of additional violence should the police fail to immediately secure Vinuya's person. Hence, the exigencies of the situation justified the initial impoundment of the house as a means to seize, or at the very least contain, Vinuya.

However, once the police had secured the house, and had evacuated the only other person (Mrs. Sardinha) known to be inside,

the exigencies of the situation began to subside. In essence, by seizing the house believed to hold their quarry, the police had eliminated the perceived threat posed by a free-roaming, allegedly armed suspect. Further, by closing Kaimana Street and impounding Vinuya's house, the police were in control of the situation. While their assignment remained hazardous, they then had time to consider their options and to plan.

The evidence indicates as much. The stated goal of the police was, at a minimum, to question Vinuya directly. If necessary, to arrest him. Toward this end, upon discovering that Vinuya was not among the evacuees of the secured house, the police called in police negotiators in an attempt to draw Vinuya out. When this tactic proved fruitless, they called for the SRT, which arrived at 1:00 a.m.—over two hours after the house had been secured. Another four hours passed before the police finally decided to enter the house at 5:17 a.m.

■ We must therefore ascertain " 'whether there [was at the time of the entry] such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant.' " *United States v. Curzi*, 867 F.2d 36, 41 (1st Cir.1989) (quoting *United States v. Adams*, 621 F.2d 41, 44 (1st Cir.1980)) (additional citations omitted). As stated above, exigent circumstances may be said to exist "when immediate police response is reasonably required to prevent imminent danger to life or serious damage to property, or to forestall the likely escape of a suspect or the threatened removal or destruction of evidence." *Apo*, 82 Hawai'i at 400, 922 P.2d at 1013 (internal quotation marks and citation omitted). Still, notwithstanding the presence of exigent circumstances, a search conducted pursuant to a warrant exception must be strictly confined in all aspects, including the temporal, within the perimeter of its original justification. *See, e.g., Ramos*, 93 Hawai'i at 510–11, 6 P.3d at 382–83.

In this case, we believe sufficient time existed to obtain a search warrant once the

---

8. The impoundment lasted from the initial seizure shortly after 10:40 p.m. on July 8, 1999, to approximately 7:51 a.m. on July 9, 1999, when

the police reopened Kaimana Street to the public.

house had been secured shortly after 10:40 p.m. Moreover, the record yields no indication that the SRT decision to enter the house four hours after its arrival was prompted by any activity in the house, or exigencies arising during the period of impoundment. The SRT apparently had the luxury of choosing its time of entry. Hence, the "heat of the moment" that justified the initial, immediate police action had given way to cool consideration of the tactics and timing to be employed in effecting Vinuya's arrest.

The circuit court identified the following factors in support of its conclusion that exigent circumstances existed at the time the SRT entered the house: [9] the police beliefs that Vinuya was the shooter, that he was still armed and that witnesses saw him returning to his house after the shots were fired; the "early morning hours"; the police report that movement was spotted inside the house; and the lack of response to police efforts to call Vinuya out via bullhorn and telephone. We accord the court's findings some deference, unless we believe them to be clearly erroneous. *Meyer*, 78 Hawai'i at 311, 893 P.2d at 162. So long as these circumstances are treated as factual findings, we see no clear error in them.

However, we exercise plenary oversight over the court's legal conclusions, *id.*, and conclude that its findings do not support the conclusion that exigent circumstances dictated the SRT's entry at 5:17 a.m. on July 9, 1999. Except for the "early morning hours," all of the other extenuations cited by the court occurred, and waned, well before the SRT entry.

That the police waited for over five hours before bringing the operation to a planned climax belies the court's conclusion that "[t]he police were justified, for the protection of the community, to enter into the residence at 586 Kaimana Street and seize the shotgun based on exigent circumstances." The police had a wealth of time and personnel. They had maximized the security and safety of the situation by securing and surrounding the house, and by cordoning off most of Kaimana Street. Although it may have been dark due to the "early morning hours," the police could

just as easily have waited for the light of day before entering, given their control of the situation. Needless to say, entry in the dark of night was not thrust upon them. In sum, the police had the situation well in hand.

The evidence hardly suggests that obtaining a search warrant would have compromised the safety of the police or the public. Or that it would have jeopardized police efforts to confine Vinuya and collect evidence. Or that it would have unduly delayed a search.

In this case, it is unnecessary to decide at what precise point the exigent circumstances dissipated, because it is evident that at some point well before the police entered the house, it could no longer be said that " 'the demands of the occasion reasonably call[ed] for an immediate police response' " that could not wait upon the issuance of a warrant. *Clark*, 65 Haw. at 494, 654 P.2d at 360 (quoting *State v. Lloyd*, 61 Haw. 505, 512, 606 P.2d 913, 918 (1980)). Nothing in the record indicates that the police were prevented from seeking a warrant. They admittedly had sufficient time in which to obtain one.

Finally, the State argues that the police "could not verify Vinuya's mental state (whether Vinuya was suicidal, wanted to create a siege situation, etc.)." Neither the State nor the circuit court raised these specters at any time below. Moreover, they are mere speculation that hardly amounts to the kind of "specific and articulable facts" required to show the existence of exigent circumstances. *Apo*, 82 Hawai'i at 400, 922 P.2d at 1013 (internal quotation marks and citation omitted).

The SRT could not, therefore, lawfully pass through the front door of 586 Kaimana Street on a claim that exigent circumstances justified a warrantless entry onto the premises. Hence, the circuit court erred in concluding that exigent circumstances justified the SRT's search and subsequent seizure of the sawed-off shotgun.

3. *The circuit court erred in denying Vinuya's motion to suppress.*

Given the foregoing, the circuit court's ruling on Vinuya's motion to suppress

---

9. The circuit court embedded the findings under-

lying its conclusion in its conclusions of law.

was wrong. In so concluding, we are guided by principles elucidated by the Hawai'i Supreme Court:

[U]nlike its federal counterpart, article I, section 7, specifically protects against "invasions of privacy." Allowing warrantless searches of an individual's home without the consent of someone authorized to give it, absent any exigent circumstances, would fly in the face of this protection.

*Lopez*, 78 Hawai'i at 446, 896 P.2d at 902 (footnote omitted). Because we have determined, *supra*, that neither consent nor exigent circumstances justified the SRT's warrantless entry and subsequent search of Vinuya's bedroom, we conclude, based upon the "adequate and independent state grounds" of article I, section 7 of the Hawai'i Constitution, *Rodriguez*, 497 U.S. at 182, 110 S.Ct. 2793, that the SRT's search was unlawful and that the sawed-off shotgun seized as a result should have been suppressed. *Cf. Ramos*, 93 Hawai'i at 513, 6 P.3d at 385 (where the "further detention and interrogation of [defendant] was unlawful, ... any evidence seized as a result should have been suppressed") (citation omitted).

*B. Harmless Error.*

██ We must therefore determine whether the improper admission of the sawed-off shotgun was harmless error. *Apo*, 82 Hawai'i at 403, 922 P.2d at 1016 ("The admission of illegally obtained evidence in a criminal trial following the erroneous denial of a motion to suppress is subject to the harmless error rule." (internal quotation marks and citations omitted).) In so deciding, we bear in mind that

error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.

*State v. Heard*, 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted). "If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside." *State v. Pulse*, 83 Hawai'i 229, 248, 925 P.2d 797, 816 (1996) (internal quotation marks and citations omitted).

██ Upon review of the entire record, we are not convinced that the error in this case was harmless beyond a reasonable doubt. The sawed-off shotgun figured prominently in the State's evidence and in closing argument.

For example, the prosecutor brandished the sawed-off shotgun during testimony about its discovery in Vinuya's bedroom. Fingerprints lifted from the shotgun were shown to match those recovered from Vinuya at the time of his arrest. An examination and testing of the shotgun revealed that it was the source of the spent shotgun shell found on Kaimana Street.[10] In his closing argument, the prosecutor often displayed the shotgun to the jury as he referred to attendant testimony. For example:

The detectives told you that this shotgun, State's Exhibit Number 1, was recovered from the bedroom closet area. And several people, Wayne Vinuya, defendant's brother, and in fact Mrs. Sardinha, defendant's mom, both indicated that, yes, that is [Vinuya's] bedroom and [Vinuya] is the only one who had a key to that bedroom.

For further example,

[Caballero] heard and saw the second shot and he also saw an object in [Vinuya's] possession, which had a nickel plating, looked like nickel plating. Similar to here, right above the trigger on this shotgun.

And,

Well, we know he was in possession of the gun. The only question is, is this a semi-automatic shotgun with a barrel length less

---

10. The testimony of the State's firearms specialist was stipulated into evidence in the form of a videotape of his deposition testimony.

than 18 inches? Well, as we discussed earlier, the evidence has shown, by the testimony of Curtis Kubo [ (the police firearms expert) ], that he measured the barrel of this gun and you're going to get to look at the barrel of this gun, and that the barrel of this gun is 12 and 9/16ths inches. So clearly the evidence is shown that this, in fact, is an illegal weapon and that it has a barrel length of less than 18 inches, and it's a semi-automatic shotgun.

Because of the State's heavy reliance upon the conclusive impact of the sawed-off shotgun at trial, it is beyond speculation that the inadmissible evidence had a telling effect on the jury. This, coupled with the almost wholly circumstantial nature of the remaining evidence, leads us irrefragably to the conclusion that there is a reasonable possibility that the admission of the sawed-off shotgun contributed to Vinuya's conviction on all five counts. Hence, the circuit court's error was not harmless beyond a reasonable doubt. The only question that remains for us is whether to reverse or remand.

## C. Sufficiency of the Evidence.

Vinuya contends that the remaining evidence at trial would be insufficient to convict him of any of the five charges against him, and thus reversal on all counts is required. See, e.g., Apo, 82 Hawai'i at 402–03, 922 P.2d at 1015–16.

As to count five, we agree and reverse, inasmuch as the State has no evidence with which to convict Vinuya of the offense of possession of a prohibited firearm under HRS § 134–8(a),[11] other than the inadmissible sawed-off shotgun. The record shows that the sawed-off shotgun was the only evidence the State could rely on to prove that the shotgun had a barrel that was less than eighteen inches long.

As to counts one through four, however, we disagree with Vinuya. In our consideration of these counts,

[i]t is well settled "that evidence adduced in the trial court must be considered in the strongest light for the prosecution when

the appellate court passes on the legal sufficiency of such evidence to support a conviction[.]" State v. Batson, 73 Haw. 236, 248, 831 P.2d 924, 931, reconsideration denied, 73 Haw. 625, 834 P.2d 1315 (1992). On appeal, the test is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the fact finder. State v. Gabrillo, 10 Haw.App. 448, 458–59, 877 P.2d 891, 896 (1994) (citation omitted). Substantial evidence is evidence "of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion." Batson, 73 Haw. at 248–49, 831 P.2d at 931 (citing State v. Lima, 64 Haw. 470, 475, 643 P.2d 536, 539 (1982)).

Apo, 82 Hawai'i at 402–03, 922 P.2d at 1015–16 (brackets in the original). Applying these principles, we conclude that even without the sawed-off shotgun, there was substantial evidence admitted at trial supporting the jury's guilty verdicts on count one (assault in the second degree), count two (carrying or use of a firearm in the commission of a separate felony), count three (place to keep firearm), and count four (prohibited possession of a firearm by a convicted felon).

"[I]ntentionally or knowingly caus[ing] bodily injury to another person with a dangerous instrument" constitutes assault in the second degree under HRS § 707–711(1)(d) (count one). At trial, the police firearms expert testified that the hip injury sustained by Kaiana was caused by birdshot fired from a shotgun. Kaiana testified that he felt a stinging sensation in his hip immediately after hearing the first blast. He further testified that he had been hit by what looked like a rock—a description consistent with birdshot discharged from a shotgun. The evidence also showed that, of the two known possible shooters, only Vinuya was in a position to fire the first blast of the shotgun that injured Kaiana (Barut, the second suspect, was sitting in his car, that was also sprayed by birdshot from the first blast). The jury therefore had sufficient evidence, independent of the shotgun, with which to find that

---

11. In relevant part, Hawai'i Revised Statutes (HRS) § 134–8(a) (1993) prohibits the possession of "shotguns with barrel lengths less than eighteen inches[.]"

Vinuya had fired the shotgun that injured Kaiana.

By the same token, there was sufficient evidence, even without the sawed-off shotgun, that Vinuya used or carried a firearm in the commission of a separate felony (count two),[12] the separate felony being assault in the second degree.

The jury also had sufficient evidence, in light of the foregoing, to conclude that Vinuya violated the provisions of HRS § 134–6(c)[13] governing the proper manner and place to keep firearms (count three), even without the evidence of the actual firearm. The evidence showed that both gun blasts occurred on a public street. Hence, the jury could justifiably infer that Vinuya had carried a loaded firearm onto Kaimana Street, and that he did so while the gun was not in an enclosed container as required by statute, which is obviously not the statutorily mandated manner or place to keep a firearm.

Finally, and again in light of the foregoing, there was substantial evidence that Vinuya was a felon in possession of a firearm (count four).[14] At trial, the State introduced into evidence a certified copy of a June 2, 1998 judgment showing that Vinuya had been convicted of theft in the second degree and unauthorized entry into a motor vehicle—both felonies—prior to the subject incident.

## V. Conclusion.

Based on the foregoing, we reverse the March 1, 2000 judgment as to count five. Further, we vacate the March 1, 2000 judgment as to counts one through four and remand for a new trial.

In vacating and remanding, we observe by way of guidance on remand that the circuit court failed to instruct the jury correctly pursuant to *State v. Jenkins*, 93 Hawai'i 87, 112–13, 997 P.2d 13, 38–39 (2000), with respect to the conduct element of possession in counts three and four.

**12.** HRS § 134–6(a) (1993 & Supp.2000) provides, in pertinent part:

> **Carrying or use of firearm in the commission of a separate felony; place to keep firearms; loaded firearms; penalty.** (a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not[.]

**13.** HRS § 134–6(c) (1993 & Supp.2000) provides, in pertinent part:

> [A]ll firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places

and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station. "Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

**14.** HRS § 134–7(b) (1993 & Supp.2000) provides:

> **Ownership or possession prohibited, when; penalty.** . . .
> (b) No person who is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition thereof.