STATE OF HAWAII, Plaintiff-Appellee, *v.* JAY BAKER PATTERSON, Defendant-Appellant

NO. 6068

NOVEMBER 29, 1977

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR AND KIDWELL, JJ.

OPINION OF THE COURT BY OGATA, J.

Defendant-appellant Jay Baker Patterson (hereinafter referred to as appellant) was indicted by the grand jury of the third circuit on August 12, 1975, on two counts of ownership or possession of a firearm by a person convicted of a felony.[1] A motion to suppress evidence was filed by counsel for appellant on August 28, 1975. Based on testimony elicited at two evidentiary hearings, the court below denied appellant's motion. Appellant now brings this interlocutory appeal from the order denying the motion to suppress. The sole question presented is whether appellant voluntarily consented to a warrantless search of his residence by police officers.

The facts of this case are by and large contradictory. However, there is little dispute as to the preliminary setting of the events which are pertinent to this case. During the early

---

[1] The indictment was brought under HRS § 134-7.

evening of July 9, 1975, police officers of the Kona District of Hawaii County responded to a report that a shot had been fired into the residence of a Mr. Terrazona. After conducting an examination of the Terrazona home, the officers concluded that the shot had been fired from the direction of appellant's residence.[2] When that determination was made, several of the officers went over to appellant's residence. They cautiously entered appellant's premises as a group, with one police officer driving his vehicle up appellant's driveway and the other officers following close behind on foot with their weapons drawn and pointed at appellant's house. Two of the officers on foot were armed with rifles in addition to their service revolvers. Upon reaching the house, the officer who was driving got out of his car and drew his pistol, also pointing it towards appellant's dwelling. All told, there were four to five armed officers positioned in the yard in front of appellant's residence.

The events which subsequently took place are in considerable dispute. Therefore, the separate versions of the police and appellant will be set out at some length here. The police officers' version indicated that upon positioning themselves in front of appellant's house, the officers asked the occupants to come out of the house, and appellant came out to talk to the officers in the yard. The officers informed appellant of their reason for being there, and appellant denied firing any shots. The police officers indicated that they reholstered their service revolvers while talking to appellant, although two officers were still carrying rifles. Appellant at first agreed to allow the police to search his home, but he then changed his mind and demanded that the police obtain a search warrant. However, appellant nevertheless invited the police officers to come into his living room. Upon receiving this express invitation, three officers entered appellant's home, and they all sat down in the living room together with appellant and his roommate, one Martinez. The officers did not at that point

---

[2] This determination was based on an inspection of the angle of the bullet holes found at the Terrazona house. Appellant's residence is located approximately 200 to 300 yards southeast of the Terrazona residence.

conduct any search of the house. The officers testified that throughout this time, appellant was cooperative and never appeared upset or afraid.[3] Shortly thereafter, police Sgt. Ronald Akau arrived at appellant's home and took charge of the investigation. Sgt. Akau spoke briefly with appellant, at which time appellant again denied any wrongdoing. Akau then asked to use the appellant's telephone, and he called a deputy prosecuting attorney to ascertain whether there was probable cause to arrest appellant. The attorney advised him that there was no probable cause to arrest as yet, although Akau continued to strongly suspect appellant and Martinez of shooting at Terrazona's home. Akau did not, however, explicitly inform appellant or Martinez that they were suspects, nor did he advise them of their *Miranda* rights. During the course of Sgt. Akau's conversations with appellant, appellant continued to deny that he fired any shots. Appellant further denied having any weapon in the house, and he told Sgt. Akau to go ahead and look through the house if he wished. Akau declined appellant's oral invitation and consent to a search of the home and told appellant that no search would be conducted without either a search warrant or a written consent to search. Akau stated that at no time did he tell appellant that a search warrant would be forthcoming. However, he did tell appellant that a search warrant might be sought upon further investigation.

Akau then sent Officer Calvin Okahara to obtain a written consent to search form from the police station. Upon Officer Okahara's return, Sgt. Akau explained the form to appellant in Okahara's presence.[4] Appellant then assured Akau that he wished to consent to a search of the house. Appellant proceeded to fill in "yes" on the consent form, thereby indicating

---

[3] The testimony of both the police and appellant indicated that appellant even offered coffee to the police officers while they were in appellant's home.

[4] According to Sgt. Akau, he placed the form on a table between himself and appellant. He then read the contents of the consent form aloud while appellant read along silently. He then asked appellant whether he still wished to consent to the search.

The consent form is a standard "Advice of Search and Seizure Rights/Waiver"

that he consented to a "complete search of [his] premises."
He then signed the form in the appropriate space. Sgt. Akau
also signed the form, and it was witnessed by Officer Oka-
hara. Sgt. Akau testified that at no time did any police officer
tell appellant that he had to sign the form, nor were any
threats or abusive statements ever made by the police offi-
cers. A search of the premises thereafter revealed two rifles,
both of which were found under appellant's bed in his bed-
room. These rifles, of course, constitute the evidence which
appellant seeks to suppress.

Appellant's version of what took place reflects a consid-
erably different set of circumstances. He maintains that he
was intimidated and forced into consenting to the search. He
testified that when he first saw the police officers, he had no
idea why they were coming onto his premises, and he was
quite shaken up by the sight of the armed officers positioned
outside his home with guns pointed in his direction. His fear
was aggravated by the fact that one of the officers threatened
to shoot if appellant did not come out in the yard immediate-
ly to talk to them. Appellant further testified that when the
officers first asked his permission to search the house, he
asked them if they had a warrant, and they told him that one
would be on the way. He then invited the officers into his
home, but only in the hope of calming down the situation and
to talk things over. Appellant stated that he was frightened by
the sight of the armed officers, at least one of whom kept a
rifle beside him, sitting in his living room. Appellant main-
tained that at no time did he give any oral consent to a search
of the house. He testified that after Sgt. Akau had finished

used by the Hawaii County Police Department. It contains, *inter alia,* the following
information:

> You have a constitutional right not to have a search made of your premises
> without a search warrant.

> A request is now being made to conduct a search of your premises without a
> search warrant for any papers, materials or objects that may be connected with
> any crime being investigated by the police.

> You have the right to refuse to consent to such a search.

making his telephone call to the deputy prosecutor, Akau told appellant that a search warrant was actually being sent over and that appellant should thus sign the written consent form just to "take care" of matters. Appellant stated that at that point he was under the impression that a search warrant had in fact been issued. According to appellant, he was then presented with the consent to search form and was simply told to sign it. He neither read the form nor had its contents read to him, and he signed the form only because he was "mixed up" at the time.[5] He also denied filling in the "yes" box himself. He stated, however, that he thought the form was some kind of a "voluntary search document."

I

Plainly, the evidence which appellant seeks to suppress was uncovered by the police during the course of a warrantless search of appellant's premises. Searches conducted without a warrant issued upon probable cause are per se unreasonable unless shown to fall within a specific exception to the warrant requirement of the Fourth Amendment.[6] *Katz v. United States,* 389 U.S. 347, 357 (1967); *see State v. Kaluna,* 55 Haw. 361, 363, 520 P.2d 51, 55 (1974). One of the specific exceptions to the requirements of both a warrant and probable cause is a search conducted pursuant to consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973); *see State v. Texeira,* 50 Haw. 138, 140, 433 P.2d 593, 596 (1967).

It is settled that consent to a warrantless search must be "voluntary" in order to be valid. *State v. Price,* 55 Haw. 442, 443, 521 P.2d 376, 377 (1974). In *State v. Price,* the Supreme Court equated "voluntary" with "uncoerced":

The Fourth and Fourteenth Amendments require that

---

[5] It is uncontradicted that the consent to search form was signed at 8:20 p.m., approximately one hour and twenty minutes after the first police unit arrived at appellant's house.

[6] The same general search warrant requirement is imposed by Art. I, § 5 of the Hawaii State Constitution.

a consent not be coerced, by explicit or implicit means, by implied threat or covert force.

*Id., quoting Schneckloth v. Bustamonte, supra,* at 228.

Appellant maintains that the consent which he gave to the search of his residence was by no means voluntary. He contends that he was forced into giving his consent by virtue of the coercive atmosphere which pervaded the evening of July 9, 1975. The circuit court, however, disagreed with appellant's version of the events which transpired at his residence on that night. It thus denied appellant's motion to suppress. We affirm that decision.

It is well-settled that when the prosecution seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving by the preponderance of the evidence that the consent was, in fact, freely and voluntarily given. *Bumper v. North Carolina,* 391 U.S. 543, 548 (1968); *United States v. Boston,* 508 F.2d 1171, 1178 (2d Cir. 1974), *cert. denied,* 421 U.S. 1001 (1975). Appellant contends, in essence, that the prosecution here failed to sustain its burden of proving that appellant's consent was voluntarily given. However, whether consent to search has been given voluntarily is a question of fact to be determined by the trial court from the "totality of all the circumstances." *Schneckloth v. Bustamonte, supra,* at 227. Considerable deference must be given in this regard to the findings of the trier of fact, who is best situated to decide the question of voluntariness. As stated by the Supreme Court of California in *People v. James,* 19 Cal.3d 99, 107, 561 P.2d 1135, 1139, 137 Cal. Rptr. 447, 451 (1977), regarding determination of the voluntariness of a consent to search:

> The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings — whether express or implied — must be upheld if supported by substantial evidence.

The role of the reviewing court on this issue is thus quite limited. We adopt the view of the majority of courts and hold

that the findings of a trier of fact regarding the validity of consent to search must be upheld unless "clearly erroneous."[7] *United States v. McCaleb,* 552 F.2d 717 (6th Cir. 1977); *United States v. Lemon,* 550 F.2d 467 (9th Cir. 1977); *United States v. Marzano,* 537 F.2d 257 (7th Cir. 1976), *cert. denied,* 429 U.S. 1038, (1977); *United States v. Peterson,* 524 F.2d 167 (4th Cir. 1975), *cert. denied,* 423 U.S. 1088 (1976); *United States v. Boston,* 508 F.2d 1171 (2d Cir. 1974), *cert. denied,* 421 U.S. 1001 (1975); *State v. Jakeway,* 221 Kan. 142, 558 P.2d 113 (1976); *People v. DeMorrow,* 59 Ill.2d 352, 320 N.E.2d 1 (1974); *Gerrard v. State,* 345 So.2d 849 (Fla.App. 1977).

It is difficult for us to conclude that, based on the record presented, the conclusions of the court below were "clearly erroneous." The record reveals substantial evidence upon which the circuit court could conclude that appellant's consent was in fact voluntarily given. Notwithstanding the fact that the testimony given before the court was highly conflicting, the court implicitly resolved the conflicts in favor of the State's witnesses. *People v. James, supra.* There was substantial evidence that appellant signed the consent to search form after being carefully and fully advised of his right

---

[7] The order denying appellant's motion to suppress evidence contains the following findings of fact:

1. That as a matter of fact, the Defendant Jay Baker Patterson did knowingly and intelligently and freely give his consent to the police to search his home for firearms;

2. That as a matter of fact, the Defendant Jay Baker Patterson was fully and completely warned by the police of his rights under the Hawaii and United States Constitutions and did freely, knowingly, and intelligently waive those constitutional rights to be free from unreasonable searches and seizures;

3. That as a matter of fact, there is no evidence of and the court finds that the police did not use fraud, trickery or coercion to gain such waiver of rights by the Defendant Jay Baker Patterson;

4. That as a matter of fact, the search of the premises conducted pursuant to the consent of the Defendant was proper in all respects and does not constitute an unreasonable search and/or seizure;

\* \* \* \* \*

to withhold consent.[8] The testimony of the police officers indicated that appellant was never under any duress or force of compulsion at the time he consented to the search. Indeed, the officers' testimony revealed that appellant was in a cooperative mood and actually encouraged the police to search the house before any consent form was signed by him. In addition, it is clear from the record that this was not the first time that appellant had been involved in a search of his dwelling, for he had previously been subjected to such a search in Kona pursuant to a warrant. As stated in *People v. James, supra,* it is evident that appellant was no "newcomer to the law." Therefore, if the police officers' version is believed to be true, as it implicitly was by the court below, there is substantial evidence indicating that appellant did not simply acquiesce to the search, but instead gave his consent knowingly, freely and intelligently.[9] When the findings of the trier of fact on a motion to suppress are based upon substantial evidence, a reviewing court cannot substitute another possible view of the evidence for that of the trier of fact. *State v. Youngblood,* 220 Kan. 782, 785, 556 P.2d 195, 197 (1976); see *Goins v. State,* 139 Ga.App. 6, 228 S.E.2d 13 (1976), and *Sutton v. State,* 558 P.2d 1193 (Okla. Crim. 1977).

II

Appellant nevertheless seems to argue that the existence of certain factual circumstances requires a finding that the consent to search was given involuntarily as a matter of law. For example, appellant contends that the arrival of police

---

[8] It should be pointed out that advisement of the right to refuse consent to a search is not required by the Fourth Amendment, *Schneckloth v. Bustamonte, supra,* and whether appellant was so advised is only one factor within the totality of the circumstances to be weighed in determining whether his consent was voluntary. *United States v. Lemon,* 550 F.2d 467, 472 n. 5 (9th Cir. 1977); *People v. James, supra,* 19 Cal.3d at 118, 561 P.2d at 1146, 137 Cal.Rptr. at 458; *Draper v. State,* 539 S.W.2d 61, 63 (Tex. Crim. 1976). However, the practice of advising a suspect of his right to refuse consent is in no way discouraged.

[9] For a similar result, see *People v. Johnson,* 41 App.Div.2d 997, 343 N.Y.S.2d 904 (1973).

officers on his premises with weapons drawn and pointed at him is a factor that negates any possibility of voluntary consent. The cases cited by appellant all seem to fall short of supporting his contention.[10] Unlike the officers in those cases, the Kona police never demanded entry to appellant's home. Also, the entry by the police into appellant's home was not obtained by force or by show of authority. The court below implicitly found that appellant voluntarily allowed the officers into his home without any duress or pressure. Furthermore, appellant was not under arrest or even in custody when he consented to the search. The instant case reflects an absence of the kinds of coercive factors which were present in the cases relied on by appellant.[11]

In addition, factors such as the number of officers present, the degree to which they emphasize their authority, and the display of weapons are some of the items comprising the so-called "totality of the circumstances." *State v. Pinkus,*

---

[10] Appellant has cited these cases in support of his position: *Harless v. Turner,* 456 F.2d 1337 (10th Cir. 1972); *Gatlin v. United States,* 326 F.2d 666 (D.C. Cir. 1963); *Catalanotte v. United States,* 208 F.2d 264 (6th Cir. 1953); *Judd v. United States,* 190 F.2d 649 (D.C. Cir. 1951); *Herter v. United States,* 27 F.2d 521 (9th Cir. 1928); *Lankford v. Schmidt,* 240 F.Supp. 550 (D.Md. 1965), *rev'd sub nom. Lankford v. Gelston,* 364 F.2d 197 (4th Cir. 1966); *United States v. Marra,* 40 F.2d 271 (W.D.N.Y. 1930); *United States v. Slusser,* 270 F.818 (S.D. Ohio 1921); *People v. Johnson,* 41 App.Div.2d 997, 343 N.Y.S.2d 904 (1973); *People v. Schomer,* 17 Cal.App.3d 427, 95 Cal.Rptr. 125 (1971); and *State v. Turkal,* 31 Ohio Misc.2d 31, 285 N.E.2d 900 (1971).

[11] The cases which appellant's counsel directed this court's attention to in oral argument also do not appear to be persuasive. While it is true that in *Herriott v. State,* 337 So.2d 165, (Ala.App.) *cert. denied,* 337 So.2d 171 (Ala. 1976), the defendant's written consent was held to be involuntary, it appears that there the Alabama court failed to follow the more widely accepted "clearly erroneous" standard of review. The view of dissenting Judge DeCarlo, who urged deference to the opportunity which the trial court had to hear and see the witnesses and to resolve conflicting evidence on the issue of validity of consent, seems more in line with the prevailing trend of thought.

On the whole, *United States v. Edmond,* 413 F. Supp. 1388 (E.D. Mich. 1976), *rev'd on other grounds,* 548 F.2d 1256 (6th Cir. 1977), seems to contain factual circumstances which differ from those in the instant case. There it was found that besides the presence of five to ten armed police officers, the defendant was threatened with impoundment of his car if he did not consent to a search, and it was only after the appearance of a tow truck that the defendant agreed to turn over his car keys. In appellant Patterson's case, no threats of any kind were found to have been made by the police, and the *Edmond* case is thus not apposite.

550 S.W.2d 829, 835 (Mo.App. 1977). Appellant emphasizes the initial display of weapons by the police, as well as the number of officers present in his home, as constituting coercive factors. Yet, no single factor is ever determinative on the issue of consent, and the display of guns by the police, though pertinent, is not conclusive. *State v. Watson,* 114 Ariz. 1, 7, 559 P.2d 121, 127 (1976), *cert. denied,* 430 U.S. 986, (1977). By the same token, the number of police officers present is not determinative, and the presence of a group of officers upon the premises does not by itself render the consent involuntary. *State v. Pinkus, supra,* 550 S.W.2d at 835. These are factors which the court below was entitled to consider within the realm of the totality of the circumstances. We are unable to agree with appellant that the factual situation here mandates a finding that appellant's consent was given involuntarily as a matter of law.

### III

Finally, the appellant asserts that whenever a person has denied guilt in the crime under investigation, but nonetheless consents to a search of his premises knowing that contraband will be uncovered by such a search, the consent given under those circumstances cannot be voluntary as a matter of law. However, the finding in the cases cited by appellant that consent was involuntary seems to stem from factual circumstances which indicate the presence of duress or coercion. To be sure, none of appellant's cases explicitly holds that the giving of consent to search with knowledge that contraband will thereby be found will alone *require* a conclusion that the consent was involuntary as a matter of law.

One of the cases relied upon by appellant, *United States v. Smith,* 308 F.2d 657 (2d Cir. 1962), *cert. denied,* 372 U.S. 906 (1963), preliminarily recites the proposition endorsed by appellant. Yet, the court of appeals in the *Smith* case upheld the validity of the defendant's consent to search despite the fact that the defendant knew that contraband would be discovered. The uncontradicted evidence in *Smith* showed that the

defendant was questioned for more than an hour before she agreed to take the narcotics agents to the place where the narcotics were kept. There was no evidence that the agents used coercion in their interrogation, which took place in a parked car on a city street in the daytime. The defendant in *Smith* agreed to take the agents to an apartment, where she produced a suitcase containing the narcotics. The court of appeals recognized that "[t]he line between an accused's voluntary consent and his involuntary submission to police authority is often difficult to draw." 308 F.2d at 663. However, the defendant was held to have been under no compulsion when she led the officers to the situs of the contraband, and she was deemed to have voluntarily consented to the search. Therefore, knowledge on the part of an accused that incriminatory evidence will be found during a search will not dictate a conclusion that the consent to search was involuntary as a matter of law.

To hold that consent is involuntary when given with knowledge that contraband will thereby be discovered would have the effect of nullifying every search which turned up incriminating evidence. *People v. James, supra.* Such a result would be absurd. Moreover, it may not be so "incredible" that a defendant would voluntarily consent to a search which he knows would disclose incriminating evidence. *Contra, United States v. Shropshire,* 271 F.Supp. 521, 524 (E.D. La. 1967). As stated in *People v. James, supra,* there may be a number of rational reasons for a suspect to consent to a search even though he knows that the premises contain incriminatory evidence:

> [F]or example, he may wish to appear cooperative in order to throw the police off the scent or at least to lull them into conducting a superficial search; he may believe the evidence is of such a nature or in such a location that it is likely to be overlooked; he may be persuaded that if the evidence is nevertheless discovered he will be successful in explaining its presence or denying any knowledge of it; he may intend to lay the groundwork for ingratiating himself with the prosecuting authorities or the courts; or

> he may simply be convinced that the game is up and
> further dissembling is futile.

19 Cal. 3d at 114, 561 P.2d at 1143, 137 Cal. Rptr. at 455. Whether these or a variety of other reasons motivated appellant Patterson to give his consent to the search was a matter for the trial court to consider along with all other factors constituting the totality of the circumstances. The circuit court was not, therefore, required to find appellant's consent involuntary as a matter of law.

Affirmed.

*D. Barclay Bryan (Kai, Dodge & Evensen* of counsel) for defendant-appellant.

*Douglas L. Halsted,* Deputy Prosecuting Attorney, County of Hawaii, for plaintiff-appellee.