CONCURRING AND DISSENTING OPINION BY
NAKAYAMA, J.,
IN WHICH RECKTENWALD, C.J., JOINS
This appeal concerns the admissibility of a hammer found in plain view in Defendant Lincoln Phillips’ (Phillips) garage, the admissibility of bloody clothing that Phillips secreted in a trash can inside his garage, and the propriety of the Circuit Court of the First Circuit’s (circuit court) restitution order. I would hold that Phillips consented to an initial search of his garage when he called 911 and admitted first responders into his home. This view follows the unanimous approach taken by state appellate courts addressing a common factual scenario and is consistent with Supreme Court precedent. The scope of Phillips’ consent, however, was limited to a brief initial search of the premises to determine whether there were other victims or perpetrators present at the scene. I would hold that the hammer and bloody clothing are admissible because the hammer was found in plain view and the bloody clothing would have inevitably been discovered. I would also affirm the circuit court’s restitution order.
I disagree with the Majority’s conclusion that because Phillips invited police in, no constitutionally regulated search occurred when the police entered Phillips’ home and garage. The Supreme Court has always treated the issue of license or consent as an aspect of whether a search was constitutionally reasonable rather than as an element of whether a search has occurred in the first place. Although the ultimate resolution may be the same, the distinction is critical because the burden is on the defendant seeking the suppression of evidence to establish that a search has occurred, whereas if the defendant carries his or her burden, the burden shifts to the government to establish that the search was reasonable. In other words, the burden shifts to the government to establish the defendant’s consent. Under the Majority’s analysis, the burden does not shift, and now the defendant has an affirmative obligation to establish that he or she did not consent to a search of a constitutionally protected area. In this respect, I dissent.
*354 I. BACKGROUND
A. Emergency Response and Investigation
At 3:54 a.m. on September 3, 2008, Phillips called 911 and stated: “I need police and an ambulance. Someone beat my wife in the head.... I came in the house from riding around and I found my wife is sleeping, she’s snoring, but ... her head is bashed in.” After completing the call, Phillips proceeded down a flight of stairs and into a fully-enclosed two-car garage attached to the house proper. Phillips moved his car out of the garage and onto the street to provide ambulance and rescue workers with access to the home’s primary entrance at the back of the garage.[1] Phillips then waited on the street so that he could direct the first responders into his home.
The Honolulu Fire Department (HFD) arrived first. Phillips flagged down the HFD engine as it arrived and led the firefighters upstairs into the master bedroom. Inside, they observed Phillips’ wife unconscious on the bed and blood spattered all over the room. The firefighters rendered basic life support services to Phillips’ wife until paramedics arrived.
Officer Stanley Collins (Officer Collins), the first police officer on the scene, arrived at 4:11 a.m. At that time, Phillips was alone and pacing in front of his garage while talking on the phone. He waved to Officer Collins, who approached and asked Phillips what had happened. Phillips stated that his wife had been hurt. Phillips then motioned in the direction of his bedroom, and Officer Collins entered. Officer Collins proceeded upstairs and observed the firefighters attending to Phillips’ wife in the master bedroom.
Officer Collins then went downstairs and surveyed the kitchen and living room. Officer Collins did not notice any signs of forced entry or theft. He asked Phillips, who was standing between the kitchen and the living room, if anything had been taken. Phillips stated that everything appeared intact. Officer Collins and Phillips returned to the garage. At trial, the parties stipulated that from the moment the police arrived, the scene was secure, and no unauthorized individuals were allowed to enter or exit.
Officer Robert Frank (Officer Frank) was the second officer on scene. He encountered Phillips and Officer Collins standing at the entrance to the garage. Unprompted by the officers, Phillips stated that “he couldn’t sleep so he left his house, went to the beach, ... drove down to the park on the main road, stopped at a 7-Eleven, picked up something to drink,” and that when “he got home, he found his wife bleeding from the head.” After explaining this, Phillips left the garage and walked to his car to retrieve his garage door opener. Phillips returned to the garage and started closing the garage door with the remote. He was attempting to demonstrate that although the garage door would close with the remote, it would not open with the remote. Phillips later explained to Officer Dennis Ahn (Officer Ahn) that because of this problem, he had left the garage door open when he went for his drive. Phillips shared that he believed that this had allowed someone to enter the home through the unlocked door at the back of the garage.
Officer Cindy Kaneshiro (Officer Kaneshi-ro) was the third police officer on scene. When she arrived, Officers Collins and Frank were speaking with Phillips in the garage. Officer Frank informed Officer Kaneshiro that Phillips’ wife was upstairs in the master bedroom. Officer Kaneshiro asked Phillips if she could enter the residence to check on his wife. Phillips agreed. Officer Kaneshiro proceeded upstairs and observed firefighters and paramedics attending to Ms. Phillips. Officer Kaneshiro called for backup because she “felt that [the police] needed further assistance at the scene.” Officer Kaneshiro then left the master bedroom and “started to assist taking photographs of the scene.”
Officer Corrine Rivera (Officer Rivera) arrived shortly thereafter and encountered Officers Collins and Frank in the garage with the defendant. Officer Rivera was “apprised by Officer Collins [as] to what had supposed *355 ly happened.” Officer Rivera then observed Phillips’ wife, who “already was in the back of the ambulance being attended by the paramedics,” and who appeared to be unconscious. Ms. Phillips was then transported to the hospital emergency room.
Sergeant Lloyd Keliinui (Sergeant Keliin-ui) arrived at 4:15 a.m. and was “the ranking officer on scene.” Sergeant Keliinui was responsible for supervising police personnel until he could be relieved by a detective from the Criminal Investigations Division. After Phillips’ wife had been transported to the hospital, Sergeant Keliinui organized the initial investigation of Phillips’ home and garage.
Officer Rivera related that she was suspicious of Phillips because “there was no blood on him and his clothes appeared to be wrinkled .. as if [they were] recently taken from a dresser drawer.” Officer Rivera believed that Phillips “would have gotten some blood on him somewhere had he checked on his wife like he said when he found her bleeding.” Officer Kaneshiro suggested that Officer Rivera take photos of Phillips to document her observations, and Sergeant Keliinui instructed her to do so. After photographing Phillips, Officer Rivera proceeded to “the master bathroom ... to check for any evidence relating to [the] crime.”
Meanwhile, in the garage, Sergeant Keliin-ui instructed Officer Jon Tokunaga (Officer Tokunaga) and Officer Collins “to check the area for any possible weapons that may have been used or any evidence involving the crime.” Officer Tokunaga and Officer Collins started outside of the house, proceeded over a wall towards an elementary school, and “checked there.” They also searched through various garbage bins in the area, but found nothing of relevance. Following this “perimeter search,” Officer Tokunaga began to search the garage. He observed a claw hammer lying on top of a blue cooler near the entrance to the garage. Officer Tokunaga noticed that the claw of the hammer appeared to have blood on it and that there was water on the hammer’s grip.
When Officer Tokunaga saw the hammer, he told Sergeant Keliinui and Officer Rivera, who had returned to the garage by that point. Just after the discovery of the hammer, Phillips, who was also in the garage, stated: “Is that the weapon that was used?” Officer Rivera responded that she did not know. An officer then asked Phillips if he recognized the hammer. He stated that it was his and that he had placed it in that area of the garage.
Officer Frank’s role at the crime scene was to “investigate [the] initial cause, which was the suspicious circumstance.” Officer Frank spent most of his shift in the garage. During his investigation, Officer Frank discovered evidence in a closed Rubbermaid style trash can at the back of the garage. At trial, he explained: “during the tour of my shift, I was sick so I had—basically I had a napkin, I blew my nose in it.” Officer Frank then approached the closed trash can, opened the lid part way, and deposited the napkin inside. While holding the lid open, Officer Frank examined the contents of the trash can because he “thought it would be pertinent to what [he was] investigating.” Among other things, Officer Frank noticed “rolled up meshed jersey type of material, clothing” that was partially obscured by empty food boxes. At that time, Phillips was seated nearby in the passenger seat of his wife’s car. Officer Frank later told Sergeant Keliinui about the mesh clothing so that it could be seized. It was ultimately determined that the clothing belonged to Phillips and that it had his wife’s blood on it.
Sergeant Keliinui’s preliminary investigation of the crime scene concluded when several detectives and members of the scientific investigation section of the crime scene unit arrived on scene. Lead Detective Taro Naka-mura (Detective Nakamura) arranged for Phillips to be transported to the Kapolei police station, which occurred at 5:32 a.m. At the station, Detective Nakamura and another detective interviewed Phillips from approximately 8:40 a.m. to 11:00 a.m. During this interrogation, Phillips was questioned extensively about the bloody clothing that had been uncovered by Sergeant Keliinui’s team during their preliminary investigation:
Q: Lincoln, getting back to your house again, outside in your garage there’s a *356 trash bin ... [t]here’s clothes in that rubbish can. Is that your clothes?
[[Image here]]
A: It’s possible. I don’t know. I have to look at it and tell you, but I’m pretty sure it’s mine.
Q: Okay, if it’s yours, why is there blood on the clothes?
A: I don’t know, I don’t know. Please, don’t tell me there’s clothes ... with my clothes with blood on it.
Q: There is clothes with blood on it. Why would your clothes have blood on it?
A: I don’t know.
[[Image here]]
Is there clothes with my blood on it? Are you serious?
[[Image here]]
Sir, I did not do this. I swear to God, I did not do this. I did not do this.
[[Image here]]
Q: Okay, so why is there blood on your clothes?
A: Sir, I don’t know, I do not know. I don’t know, I don’t know. I truly do not know why there’s blood on my clothes in the trash can. I don’t know.
[[Image here]]
Q: You don’t know how the blood got on your clothes?
A: No, sir. I don’t know; I haven’t seen the clothes.
[[Image here]]
Q: Lincoln, we’re going to have to go back to your house and process more of your house.
[[Image here]]
A: Okay, but I did not do this. Now the clothes, let’s just talk about the clothes, the clothes. If it’s my clothes, oh, my God, I didn’t do this. I swear to God, I did not do this.
Q: Now Lincoln, there’s no reason her blood should be on your clothes.
A: I understand that and I agree with that.
After the interview was completed, Phillips was released. However, his house remained secured by police until they obtained a warrant at 7:45 p.m. At that time, detectives and crime scene specialists completed an “in-depth scene processing” of Phillips’ home.
B. Procedural History
On September 10, 2008, the State indicted Phillips for attempted murder in the second degree. Phillips filed a motion to suppress evidence and statements on April 24, 2009. Among other things, Phillips sought to suppress the hammer that was recovered in plain view and the clothing that was secreted in the trash can in his garage because both were recovered before the police obtained a warrant. The circuit court denied Phillips’ motion with respect to the hammer and the clothing, concluding that the hammer was found in plain view and that the clothing would have inevitably been discovered by lawful means.[2]
The hammer and clothing were admitted into evidence at trial, and the jury subsequently found Phillips guilty of attempted murder. Phillips was sentenced to life imprisonment with the possibility of parole and was ordered to pay $ 6,530 in restitution to Ms. Phillips’ mother to cover funeral expenses and transportation costs related to Ms. Phillips’ death. The restitution order was based on the circuit court’s determination that Ms. Phillips “would not have died but for [Phillips’] conduct.”
Phillips timely appealed to the ICA, raising three points of error. First, he argued that the hammer should have been suppressed under the plain view doctrine because its discovei’y was not inadvertent and because the police did not have justification to seize the hammer without obtaining a warrant. Second, he argued that the clothing would not have been inevitably discovered by lawful means because there was insufficient legally obtained evidence to support the issuance of a search warrant. Finally, Phillips argued that the circuit court erred in ordering restitution because the State had failed to show that Ms. Phillips died as a result of Phillips’ conduct.
*357 The ICA issued a summary disposition order on December 12, 2011. In a split decision, the ICA Majority held that the circuit court erred by failing to suppress the evidence of the hammer. The ICA Majority reasoned that because Officer Tokunaga was ordered to search the premises for weapons and other evidence, the “seizure of the hammer under the plain view doctrine was not valid” because it was not inadvertent. The ICA Majority ordered that the case be remanded to the circuit court for a new trial, and based on that order, held that Phillips’ other asserted errors were moot.
Judge Reifurth filed a dissenting opinion. He would not have applied the inadvertance requirement of the plain view doctrine, and instead explained: “Phillips’ implied consent is the proper starting point for our analysis.... Because the record in this ease firmly supports the conclusion that Phillips had impliedly consented to an investigation of the circumstances of his wife’s attack,” the war-rantless search leading to discovery of the hammer was lawful. With respect to the clothing, Judge Reifurth would have affirmed the circuit court’s conclusion that it inevitably would have been discovered pursuant to a lawfully obtained search warrant. Judge Rei-furth would have also affirmed the circuit court’s order of restitution.
The State timely filed an application for writ of certiorari requesting this court’s review.
II. STANDARD OF REVIEW
We review questions of constitutional law de novo, under the right/wrong standard. State v. Hauge, 103 Hawai'i 38, 47, 79 P.3d 131, 140 (2003). “Accordingly, ‘[w]e review the circuit court’s ruling on a motion to suppress de novo ....’” Id. (quoting State v. Locquiao, 100 Hawai'i 195, 203, 58 P.3d 1242, 1250 (2002)).
A judge has broad discretion in matters related to sentencing. State v. Savitz, 97 Hawai'i 440, 443, 39 P.3d 567, 570 (2002). Thus, we will not disturb a sentencing court’s decisions regarding restitution absent an abuse of discretion. Id.; see also State v. Griffin, 83 Hawai'i 105, 108-09, 924 P.2d 1211, 1214-15 (1996) (reviewing the circuit court’s award of restitution for abuse of discretion).
III. DISCUSSION
The primary issue in this case is whether police engaged in an unreasonable search in violation of the defendant’s constitutional rights when they entered his garage without a warrant. I would hold that although a search did occur, the police’s conduct was constitutionally reasonable insofar as Phillips consented to their presence inside his garage for the purpose of assisting his injured wife and for the purpose of conducting an initial search of the premises for other possible victims or perpetrators. Because the hammer was discovered in plain view during the course of this preliminary investigation, it was admissible at trial. Furthermore, even though the search of the closed trash can exceeded the scope of Phillips’ consent, the bloody clothing was also admissible because it would have been inevitably discovered.
A. Fourth Amendment Analysis
The Fourth Amendment provides that the “right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.” Article I, section 7 of the Ha-wai'i Constitution further provides that the right of the people to be secure against unreasonable invasions of privacy shall not be violated. “Our willingness to afford greater protection of individual privacy rights than is provided on the federal level ... requires that governmental intrusions into the personal privacy of citizens ... be no greater in intensity than absolutely necessary.” State v. Lopez, 78 Hawai'i 433, 445-46, 896 P.2d 889, 901-02 (1995).
As the constitutional texts indicate, the protections of article I, section 7 and the Fourth Amendment guard against unreasonable government searches and seizures. State v. Kaaheena, 59 Haw. 23, 28, 575 P.2d 462, 466 (1978); United States v. Jones, 565 U.S. 400, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). Thus, whether the constitution has been violated requires ascertaining first whether a constitutionally regulated search has oc *358 curred, and if so, whether the search was done in a reasonable fashion. Kaaheena, 59 Haw. at 28, 575 P.2d at 466; Jones, 132 S.Ct. 945. With respect to the latter inquiry, this court has repeatedly stated that searches conducted without a warrant are “presumptively unreasonable” subject to certain reasonable exceptions. Lopez, 78 Hawai'i at 442, 896 P.2d at 898. One exception to the warrant requirement is a search conducted pursuant to the defendant’s license or consent. Id. at 443, 896 P.2d at 899, Consensual searches are allowable “because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.” Florida v. Jimeno, 500 U.S. 248, 250-51, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).
Defendants carry the initial burden of proof of establishing that they were the subjects of a search. See Rakas v. Illinois, 439 U.S. 128, 130 n.1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); State v. Spillner, 116 Hawai'i 351, 357, 173 P.3d 498, 504 (2007). If the defendant establishes that a warrantless search occurred, the “State has the burden of overcoming [the] initial presumption of unreasonableness by proving that the search falls within one of the well-recognized and narrowly-defined exceptions to the general warrant requirement of the fourth amendment.” State v. Paahana, 66 Haw. 499, 504, 666 P.2d 592, 596 (1983). With respect to consent:
A consensual search is confined to the terms of its authorization. The scope of the actual consent restricts the permissible boundaries of a search in the same manner as the specifications in a warrant. If the government does not conform to the limitations placed upon the right granted to search, the search is impermissible. In justifying a consensual search, the government bears the burden of establishing that the search was conducted within the purview of the consent received.
United States v. Strickland, 902 F.2d 937, 941 (11th Cir. 1990) (citations omitted). The State also bears the burden of establishing that consent was freely and voluntarily given.
The Majority asserts that no search occurred under either the Jones and Jardines test or the Katz test because Phillips invited police into his garage. However, in doing so, the Majority has conflated the long established analysis laid out above. Under the Majority’s opinion, the consent exception to the warrant requirement has been done away with and absorbed into the analysis of whether a Fourth Amendment search has occurred. Now, courts must consider whether a defendant has consented to a search to determine if a search occurred at all. This circular analysis cannot be reconciled with the decades of Hawaii state and federal ease law that have established that whether a defendant has consented to a search is an inquiry into the reasonableness of a search and not an inquiry into whether a search has occurred. Illinois v. Rodriguez, 497 U.S. 177, 183-84, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (explaining that a defendant is assured by the Fourth Amendment that no government search will occur that is unreasonable and that one of the elements that makes a search of a person’s house “reasonable” is the consent of the person or his cotenant). Moreover, the Majority has shifted a significant burden from the prosecution to defendants, as defendants are now responsible for establishing that they did not consent to police presence in order to show that they were subject to a search.
Thus, although I concur in the Majority’s result, I must firmly dissent from the Majority’s opinion. The proper analysis under the Fourth Amendment is to analyze whether a search occurred, and if so, whether the search was nevertheless reasonable because the defendant consented to the search.
1. A Search Occurred
As a threshold matter, we must address “whether the [police] activity did, in fact, constitute a search” within the scope of article I, section 7 and the Fourth Amendment. Kaaheena, 59 Haw. at 28, 575 P.2d at 466; United States v. Jones, 565 U.S. 400, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). There are two tests that determine whether the State has engaged in a constitutionally regulated search. First, under the property-rights baseline of the Fourth Amendment, “[w]hen ‘the Government obtains information by physically intruding1 on persons, houses, papers, or effects, ‘a “search” within the origi *359 nal meaning of the Fourth Amendment’ has ‘undoubtedly occurred.’ ” Florida v. Jardines, — U.S. -, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013) (quoting United States v. Jones, 565 U.S. 400, 132 S.Ct. 945, 950-51, n.3, 181 L.Ed.2d 911 (2012)). Second, under the privacy-based theory of the Fourth Amendment, a search occurs when the State obtains evidence by intruding upon an individual’s reasonable expectation of privacy. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring) (articulating the requirement that an individual harbor a subjective expectation of privacy that society is willing to recognize as reasonable).
In Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court stated that “the Fourth Amendment protects people, not places,” and held that a defendant’s Fourth Amendment rights were violated by the attachment of an eavesdropping device to a public telephone booth. Id. at 351, 88 S.Ct. 507. In concurrence, Justice Harlan explained that this was so because a Fourth Amendment violation occurs when government officials intrude upon an individual’s “reasonable expectation of privacy[.]” Id. at 360, 88 S.Ct. 507 (Harlan, J., concurring). Justice Harlan’s two-part reasonable expectation of privacy test has been applied with regularity as the constitutional “lodestar” by the Supreme Court and by this court since that time. See, e.g., Smith v. Maryland, 442 U.S. 735, 739, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); State v. Stachler, 58 Haw. 412, 416, 570 P.2d 1323, 1326 (1977). This court has stated,
In ascertaining whether an individual’s expectation of privacy brings the governmental activity at issue into the scope of constitutional protection, this court utilizes the following two-prong test, borrowed from Justice Haiian’s concurring opinion in Katz v. United States ... : “First, one must exhibit an actual, subjective expectation of privacy. Second, that expectation must be one that society would recognize as objectively reasonable.” Bonnell, 75 Haw. 124, 139, 856 P.2d 1265, 1274 (1993) (citations and internal quotations omitted).
Lopez, 78 Hawai'i at 441-42, 896 P.2d at 897-98.
“There is no question that a person generally has an actual, subjective expectation of privacy in his or her home. Nor is there any question that the expectation of privacy in one’s home is one that society recognizes as objectively reasonable.” Id. at 442, 896 P.2d at 898. “[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment’s ‘very core’ stands ‘the right of a man to retreat into his own home and there be free from unreasonable government intrusion.’ ” Jardines, 133 S.Ct. at 1414, (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). “At common law, the curtilage is the area to which extends the intimate activity associated with the sanctity of a man’s home and the privacies of life.” California v. Ciraolo, 476 U.S. 207, 212, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (internal quotation marks and citation omitted). This area around the home is “intimately linked to the home, both physically and psychologically,” and is a place where “privacy expectations are most heightened.” Id. at 213, 106 S.Ct. 1809.
“While the boundaries of the curtilage are generally ‘clearly marked,’ the ‘conception defining the curtilage’ is at any rate familiar enough that it is ‘easily understood from our daily experience.’” Jardines, 133 S.Ct. at 1415 (quoting Oliver v. United States, 466 U.S. 170, 182 n.12, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)). In this case, there is no doubt that the police entered it: a fully attached garage which contained at its rear the home’s primary entrance is a “classic exemplar of an area adjacent to the home and ‘to which the activity of home life extends.’” M.; see also Los Angeles Police Protective League v. Gates, 907 F.2d 879, 884-85 (9th Cir. 1990) (holding that an “attached garage” that “has a door leading directly into a room of the house” was “entitled to the cloak of protection ... thrown over” the house itself).
Here, Phillips’ garage undoubtedly qualifies as curtilage. Not only was Phillips’ fully enclosed garage immediately adjacent to his home and the home’s primary entrance located at the garage’s rear, but the contents of the garage reveal that it was “intimately *360 linked” to the Phillips’ home life. It contained, for example, the family’s washer and dryer, a free-standing freezer, and a large “Rubbermaid style” trash can. In addition, the garage door, when dosed, would ensure an equivalent degree of privacy and security as the home itself. Because Phillips had a subjective expectation of privacy in his garage, and the expectation is one that society recognizes as objectively reasonable, a Fourth Amendment search undoubtedly occurred. Thus, the question becomes whether the search was reasonable.
2. The Initial Search Was Reasonable
“[Sjearches and seizures inside a home without a warrant are presumptively unreasonable, ... subject to certain reasonable exceptions.” Kentucky v. King, 563 U.S. 452, 459, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) (internal quotation marks and citations omitted). “[A] search premised on consent is a recognized exception 'to the well-established rule that all searches conducted without a warrant are deemed to be unreasonable per se.’ ” State v. Russo, 67 Haw. 126, 137, 681 P.2d 553, 562 (1984) (quoting Nakamoto v. Fasi, 64 Haw. 17, 21, 635 P.2d 946, 951 (1981)). “ ‘[Cjonsent in the constitutional sense ... means more than the absence of an objection from the individual being subjected to a search. It must be shown that such consent was, in fact, freely and voluntarily given.’ ” Id. (quoting State v. Patterson, 58 Haw. 462, 467, 571 P.2d 745, 748 (1977)). “Whether consent to a search was freely and voluntarily given ... must be determined from the totality of eircumstanees[.]” Id. Despite “the absence of an express indication,” consent may be implied from an individual’s words, gestures, or conduct. See State v. Hanson, 97 Hawai'i 71, 75, 34 P.3d 1, 5 (2001).
Phillips expressly consented to the initial police intrusion into his home and its curti-lage. He called 911 and stated: “I need police and an ambulance. Someone beat my wife in the head.” When police and firefighters arrived, Phillips waved to them and led them through the garage and into his home. When additional police and emergency units arrived, Phillips allowed them all to enter his home, and when Officer Kaneshiro explicitly asked if she could enter the residence, Phillips stated that she could. Thus, Phillips’ express consent to the initial governmental search of his home and its curtilage is beyond doubt.
B. This Analysis Is Consistent With Case Law
1. Other State Appellate Decisions
Numerous state appellate decisions address this precise legal issue under very similar facts. See, e.g., State v. Young, 135 Ariz. 437, 661 P.2d 1138 (Az. App. 1982); State v. Fleischman, 157 Ariz. 11, 754 P.2d 340 (Az. App. 1988); State v. Brady, 585 So.2d 524 (La. 1991); State v. Dowling, 387 So.2d 1165 (La. 1980); Commonwealth v. Beldotti, 409 Mass. 553, 567 N.E.2d 1219 (1991); State v. Fredette, 411 A.2d 65 (Me. 1979); State v. Wilshire, 509 A.2d 444 (R.I. 1986); Johnson v. State, 226 S.W.3d 439 (Tex. Crim. App. 2007); Brown v. State, 856 S.W.2d 177 (Tex. Crim. App. 1993); State v. Flippo, 212 W.Va. 560, 575 S.E.2d 170 (2002). In each of these cases, the defendant called the police to report a crime that occurred at either his/her residence, place of rental, or place of business. And in each of these cases, the appellate courts determined that by calling the police, the defendants consented to, at minimum, the initial entry by police.
Thus, these cases illustrate the widespread acceptance that a search does occur when the police are called to a residence or other place in which the defendant has a reasonable expectation of privacy but that the search is reasonable because of the defendant’s consent.
2. Supreme Court Precedent
The approach unanimously employed by the state appellate courts flows directly from a framework established by a trio of Supreme Court cases that govern situations where the police respond to a murder scene in a constitutionally protected area and obtain evidence without a warrant. In the progenitor case, Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 2412-13, 57 L.Ed.2d 290 (1978), the Supreme Court held that there is *361 no murder scene exception to the warrant requirement. The Court made clear that a warrantless search in these circumstances “cannot be justified on the ground that no constitutionally protected right of privacy was invaded.” Id. at 2413. Thus, pursuant to Mineey, once a homicide scene has been secured, the police are without authority to conduct a general search without a warrant absent consent or some other recognized exception to the warrant requirement.
Following this principle, in both Thompson v. Louisiana, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984), and Flippo v. West Virginia, 528 U.S. 11, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999), the Supreme Court reversed state appellate courts that held that the Fourth Amendment did not apply to searches conducted at a murder scene in a home.[3] In both cases, the Court held that the act of summoning police and emergency responders to a home—whether directly, as was the case in Flippo, or indirectly by calling a third party, as was the case in Thompson—“can hardly be seen as an invitation to the general- public that would have converted [the] home into the sort of public place for which no warrant to search would be necessary.” 469 U.S. at 22, 105 S.Ct. 409. In both Flippo and Thompson, the Supreme Court remanded with instructions for the state appellate courts to analyze whether the defendants had consented to a search of their homes, or whether any of the exceptions to the warrant requirement might apply. See Thompson, 469 U.S. at 23, 105 S.Ct. 409; Flippo, 528 U.S. at 14, 120 S.Ct. 7. Thus, Flippo and Thompson articulate that even when police are called to investigate a crime, the Fourth Amendment threshold has been crossed, and the remaining question is whether the defendant explicitly or implicitly consented to the search.
3. Prior Decisions of this Court
My determination that a search occurred is also in accordance with prior decisions of this court. In State v. Patterson, 58 Haw. 462, 471, 571 P.2d 745, 750 (1977), evidence was gathered after the defendant “voluntarily allowed ... officers into his home without any duress or pressure.” This occurred after “four to five armed officers positioned in the yard in front of [defendant’s] residence” had discussed a recent shooting with the defendant, at which point the defendant “invited the police officers to come into his living room. Upon receiving this express invitation, three officers entered [defendant’s] home, and they all sat down in the living room together with [defendant] and his roommate.” Id. at 464, 571 P.2d at 747. After being told “that no search would be conducted without either a search warrant or a written consent to search,” the defendant consented to a search that yielded evidence. Id. at 465-66, 571 P.2d at 747-48. On appeal, this court stated: “Plainly, the evidence which [defendant] seeks to suppress was uncovered by the police during the course of a warrantless search of [defendant’s] premises.” Id. at 467, 571 P.2d at 748 (emphasis added). The court then engaged in a searching inquiry to determine whether the defendant’s consent was voluntary, and concluded that it was. Id.
Thus, this court has held that, under the circumstances of an invitation to and voluntary admittance of several police officers into a home by a resident, the protections of article I, section 7 and the Fourth Amendment are implicated, and the court must analyze the voluntariness and scope of the defendant’s consent. Those principles apply in this case.
C. The Circuit Court Properly Admitted the Hammer and Clothing Into Evidence
Having concluded that Phillips consented to the initial entry by police and paramedics, the remaining question is whether Phillips’ consent also allowed the police to search in the manner that they did. “[T]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose.” Jardines, 133 S.Ct. at 1416 (emphasis added); see also State v. Thornton, 121 Hawai'i 533, 539, 221 P.3d 511, 517 (App. 2009) (“The scope of the actual consent restricts the permissible boundaries of a search in the same manner as the specifications in a *362 warrant")- Thus, the key question is whether the scope of Phillips’ consent extended to the search of his garage.
In Young, the owner of a bar where a homicide occurred called the police to report a shooting. 661 P.2d at 1139. Police officers arrived and secured the scene, and about one hour later, homicide detectives arrived and conducted a search of the bar, where they found the murder weapon hidden above a ceiling tile. Id. The Court of Appeals of Arizona affirmed the circuit court’s suppression of the gun, holding that
once the homicide scene had been secured, the police were without authority to conduct a general search of the premises without a warrant absent either consent or some other recognized exception to the warrant clause of the fourth amendment. We agree with the trial court that the evidence does not support a finding that the owner ... consented to a wholesale search of the premises merely by calling the police to the homicide scene or because the bar was a public establishment.
Id. at 1141. See also Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 99 S.Ct. 2319, 2326, 60 L.Ed.2d 920 (1979) (“[T]here is no basis for the notion that because a retail store invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees.”).
I agree that when a defendant calls the police to a place in which he/she has a reasonable expectation of privacy, and the defendant reports that a crime has been committed there, he/she consents to a brief search of the premises by the police so that the police can secure the location and determine whether there are other victims or perpetrators present at the scene. The defendant’s consent, however, does not extend to a wholesale search of the premises such that the police are then free to go through bathroom and kitchen cabinets, personal effects, or closed containers.
Turning to the instant case, the scope of Phillips’ consent was limited to a brief investigative search of his home and garage to secure the location and make sure that there were no other victims or possible perpetrators present at the scene. Absent a warrant or an exception to the warrant requirement, the police were not authorized by Phillips’ 911 call to conduct a general search of his home.
1. Seizure of the Hammer Was Lawful Because It Was In Plain View
During the initial search, Officer Tokunaga and Officer Collins performed a perimeter search of the area surrounding Phillips’ home and then returned to search the garage. It was at that point in time that Officer Tokuna-ga saw the hammer that was lying in plain view. Because the officers were conducting a brief investigative search that was within the scope of Phillips’ consent at the time the hammer was discovered, the hammer was lawfully seized under the plain view exception. Therefore, the circuit court did not err in admitting the hammer into evidence.
2. The Search of the Closed Trash Can Exceeded the Scope of Phillips’ Consent, But the Search Was Nevertheless Reasonable Under the Doctrine of Inevitable Discovery
Because the scope of Phillips’ consent only extended to a brief search of the premises to locate other possible victims or perpetrators, Phillips’ consent did not extend to the opening of closed containers such as the trash can in his garage. Therefore, the search of the trash can by Officer Frank and the subsequent seizui’e of the bloody clothing hidden within were not justified by Phillips’ call to 911,
However, because the record indicates that Phillips’ home and garage were secured by police until they obtained a search warrant and the warrant included the search of all closed containers, the bloody clothing would have inevitably been discovered. Therefore, the circuit court did not err in admitting the bloody clothing at trial.
D. The Majority’s Analysis is Flawed
1. The Police Did Intend to Search for Evidence
Although I do not employ the Jones/Jar-dines search analysis, I disagree with the *363 Majority’s assertion that no search occurred because the police did not intend to search and collect evidence in Phillips’ garage. The factual record in this ease contains extensive evidence of the police’s intent to search. For example, Sergeant Keliinui testified that he ordered several officers “to check the area for any possible weapons that may have been used or any evidence involving the crime.” This order led to the discovery of the hammer. Officer Frank testified that his role at the crime scene was to “investigate [the] initial cause, which was the suspicious circumstance,” and that when he encountered a closed trash can in Phillips’ garage, he examined its contents because he “thought it would be pertinent to what [he was] investigating.” This led to the discovery of the bloody clothing. Officer Rivera testified that after Sergeant Keliinui ordered her to photograph the defendant, she proceeded to “the master bathroom ... to check for any evidence relating to [the] crime.” In short, there is overwhelming evidence that the police intended to search for evidence when they physically occupied Phillips’ home and curti-lage.
2. The Majority’s Analysis of the Garage is Flawed
The Majority’s subjective expectation of privacy analysis is based on an overly broad reading of the record, stating: “Phillips has not disputed his lack of a subjective expectation of privacy at any point during this case. Phillips acknowledged this point at the hearing on the motion to suppress ... [and] Phillips also conceded this to the ICA[.]” However, Phillips did not concede that he lacked a subjective expectation of privacy. He merely conceded that, in the context of the first plain view factor, he had consented to the initial police intrusion by calling the police and allowing them into his home. And Phillips can hardly be charged with failing “to disput[e] his lack of a subjective expectation of privacy,” because he would have had no occasion to do so. A Katz analysis was never placed in dispute before the ICA, and it was not raised in the State’s application to this court.
The remainder of the Majority’s Katz analysis is not supported by precedent. The unanimous view of state appellate courts is that when an individual calls 911 stating that a third person is responsible for an assault in their home, the proper analysis requires applying the Fourth Amendment, analyzing its exceptions, and enforcing the limitations on those exceptions when appropriate. See, e.g., Fredette, 411 A.2d at 68 (defendant called the police claiming a third person had shot her husband, ushered police inside, and remained on scene during a search that yielded evidence); Johnson, 226 S.W.3d at 441 (defendant called the police claiming that she had shot her husband, stood in front of her garage while police arrived, admitted the police into her home, and remained on scene during a preliminary investigation); Brown, 856 S.W.2d at 182 & n.2 (collecting cases). This view is derived from the Supreme Court’s decisions in Flippo and Thompson. The facts cited by the Majority, that Phillips called the police to his home, claimed his wife had been attacked by a third party, ushered police inside, and remained on scene during the initial investigation, are not unique and do not suggest that a deviation from unanimous precedent would be appropriate in this case.
Moreover, although the Majority concludes that the police did not engage in a constitutionally regulated search, it fails to address when a Fourth Amendment search arose such that the inevitable discovery exception is needed to justify the discovery and seizure of the bloody clothing. Under the Majority’s analysis, the police had license to enter and search the premises and Phillips did not have a reasonable expectation of privacy in his garage because he exposed it to the police; the government action was not subject to the Fourth Amendment. Yet the Majority then contradictorily concludes that an exception is needed to justify the discovery and seizure of the clothing. It is unclear under the Majority’s analysis where the constitutional boundary lies.
3. The Majority Eviscerates Privacy Rights
The Majority has held that “Phillips did not have a reasonable expectation of privacy *364 in exposed areas of the garage.” This holding eviscerates privacy rights by placing an entire class of consensual and emergency home searches outside the scope of the Fourth Amendment.
Warrantless searches of a home are presumptively unreasonable subject to well-established exceptions to the warrant requirement. See King, 563 U.S. at 459, 131 S.Ct. 1849. These exceptions have the salutary effect of protecting privacy by imposing limitations on police conduct. For example, the State has the burden of establishing that consent has been voluntarily given, and individuals maintain the right to limit consent or to revoke consent and insist that the police obtain a warrant. See Jimeno, 500 U.S. at 252, 111 S.Ct. 1801; see also United States v. Dyer, 784 F.2d 812, 816 (7th Cir. 1986) (“Clearly a person may limit or withdraw his [or her] consent to a search, and the police must honor such limitations.”). The right to revoke consent would be meaningless if the act of consenting to a police intrusion resulted in the total absence of expectation of privacy. The defendant would then lack standing to assert that his right to revoke consent had been violated. And this would be true even if the defendant had summoned the police to respond to a low-grade property crime in the home rather than a serious assault.
IV. CONCLUSION
For the foregoing reasons, I would reverse the ICA’s October 10, 2013 judgment on appeal and affirm the circuit court’s December 12, 2011 amended judgment of conviction and sentence.

. The Honorable Karen S.S. Ahn presided.

. In Flippo, the search occurred in a rented cabin.